**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Joseph J. DiPasquale, Esq.
Eric S. Chafetz, Esq.
Michael Papandrea, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and
Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>FRANK THEATRES BAYONNE/SOUTH COVE, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-34808 (SLM)<br><br>(Joint Administration Requested) |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361 AND 363 (III) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362 AND 364(c) AND (d), (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO THE DIP LENDERS PURSUANT TO 11 U.S.C. § 364(c), (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

The above-captioned debtors and debtors-in-possession (collectively, the

"Debtors" or the "Company"), by and through their undersigned proposed counsel, submit this

motion (the "Motion") for entry of an interim order substantially in the form submitted herewith

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  Frank Theatres Bayonne/South Cove, LLC (3162); Frank Entertainment Group, LLC (3966); Frank Management LLC (0186); Frank Theatres, LLC (5542); Frank All Star Theatres, LLC (0420); Frank Theatres Blacksburg LLC (2964); Frank Theatres Delray, LLC (7655); Frank Theatres Kingsport LLC (5083); Frank Theatres Montgomeryville, LLC (0692); Frank Theatres Parkside Town Commons LLC (9724); Frank Theatres Rio, LLC (1591); Frank Theatres Towne, LLC (1528); Frank Theatres York, LLC (7779); Frank Theatres Mt. Airy, LLC (7429); Frank Theatres Southern Pines, LLC (2508); Frank Theatres Sanford, LLC (7475); Frank Theatres Shallotte, LLC (7548); Revolutions at City Place LLC (6048); Revolutions of Saucon Valley LLC (1135); Frank Entertainment Rock Hill LLC (0753); Frank Entertainment PSL, LLC (7033); Frank Hospitality Saucon Valley LLC (8570); Frank Hospitality York LLC (6617); and Galleria Cinema LLC (2529).

(the "Interim Order"), and a final order (the "Final Order," and together with the Interim Order,

the "DIP Orders") pursuant to sections 105(a), 361, 362, 363 and 364 of title 11 of the United

States Code, 11 U.S.C. §§ 101, *et. seq.* (the "Bankruptcy Code"):

i.    authorizing the Debtors to obtain secured postpetition financing in accordance with
      (a) that certain Senior Secured Debtor in Possession Credit Agreement, dated as of
      December 19, 2018 (the "DIP Credit Agreement," collectively with any other
      agreements and documents executed or delivered in connection therewith, each as
      may be amended, restated, supplemented, or otherwise modified from time to time,
      the "DIP Financing Documents"), substantially in the form attached to the Interim
      Order as **Exhibit B**, between the Borrower, the Subsidiary Guarantors, the DIP Agent
      and the DIP Lenders from Elm Park Capital Management, LLC, as Administrative
      Agent (in such capacity, the "DIP Agent") and the lenders that are parties thereto
      (collectively, the "DIP Lenders"), consisting of a credit facility in the aggregate
      principal amount of up to $5.5 million on a final basis and $1,000,000 on an interim
      basis (the "DIP Financing" or  the "DIP Facility") for the purpose of effectuating the
      restructuring transactions contemplated by the Restructuring Support Agreement (the
      "RSA"), including funding the Debtors' general operating and working capital needs
      and the administration of the Debtors' chapter 11 cases (the "Chapter 11 Cases"), and
      (b) the budget ("the Approved Budget") attached to the Interim Order as **Exhibit A**;

ii.   authorizing the Debtors' continued use of the Senior Lenders' and Subordinated
      Lenders' Cash Collateral pursuant to section 363 of the Bankruptcy Code[2];

iii.  granting adequate protection for such use of Cash Collateral pursuant to sections 361
      and 363 of the Bankruptcy Code;

iv.   authorizing the Subsidiary Guarantors to enter into that certain Guaranty, dated as of
      December 19, 2018, by and among the Subsidiary Guarantors that are parties thereto

---

[2] Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to such terms (a) later in
this Motion, (b) in the Interim Order, or (c) in the DIP Credit Agreement.

and the DIP Agent, a true and correct copy of which is attached to the Interim Order as **Exhibit C**;

v.  granting to the DIP Lenders valid, fully perfected, and enforceable security interests and liens (collectively, the "DIP Liens") in and upon the DIP Collateral (as defined in the DIP Credit Agreement) pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code;

vi.  granting an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") to the DIP Lenders pursuant to section 364(c)(1) of the Bankruptcy Code;

vii.  vacating and modifying the automatic stay to the extent necessary to effectuate the terms and provisions of the DIP Credit Agreement and the DIP Orders;

viii.  Approval of the Roll Up of the Existing Protective Advances, which consist of new money advanced on an emergency basis to support the Debtors' ongoing operations prior to the Debtors' bankruptcy filing, and which constitute only 14.6% of the total amount loaned by the Senior Lenders (defined herein);

ix.  waiving, upon entry of the Final Order, the rights of the Debtors to surcharge the DIP Collateral, Senior Collateral and Junior Collateral (each as defined below) under section 506(c) of the Bankruptcy Code; and

x.  scheduling a hearing (the "Final Hearing") pursuant to Rules 4001(b)(2) and (c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to consider entry of the Final Order, authorizing and approving the DIP Financing and use of Cash Collateral on a final basis.

In support of this Motion, the Debtors rely upon the *Declaration of Christopher Lang in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith, and further state as follows:

## JURISDICTION, VENUE AND STATUTORY PREDICATES

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief requested herein are sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 4001, 6004 and 9014, and Rule 4001-3 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## BACKGROUND

### A.      General Background

3.      On the date hereof (the "Petition Date"), each of the above-captioned Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").  The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner and no committee has been appointed in these Chapter 11 Cases.

4.      The Debtors operate pure play movie theatres, combination movie theatre/family entertainment complexes, and pure play family entertainment complexes in six (6) east coast states — New Jersey (including theaters located in Bayonne and Rio Grande), Florida, North Carolina, South Carolina, Pennsylvania, and Virginia — under the brand names Frank Theatres, CineBowl & Grille, and Revolutions.  The Company operates 15 movie theatre and/or family entertainment venues broken down as follows:  (a) nine (9) pure play movie theatres in the six aforementioned states under the Frank Theatres name, (b) three (3) combination movie theatre/family entertainment complexes in Florida, North Carolina, and Virginia under the

CineBowl & Grille marquee, and (c) three (3) family entertainment complexes in three (3) states (Florida, South Carolina, and Pennsylvania) under the Revolutions brand name.

5.     The Company's Frank Theatres cinemas include 141 total screens, while each theater generally has 8-12 screens, offers stadium seating, 4k digital and 3D capable projection, Dolby® Digital surround sound, advance ticketing features and standard theatre concessions.   Certain locations also offer IMAX® or THX® technology and enhanced concessions, which include beer/wine and premium restaurant-style food.   Frank Theatres, including its predecessor, is one of the oldest continuously operating movie theatre chains in the United States.

6.     The Company's CineBowl & Grille concept, the first of its kind in the United States, combines a traditional stadium seating movie theatre with bowling, a redemption arcade, and a captive casual dining restaurant/bar under one roof.   Likewise, the Company's Revolutions concept combines bowling, a redemption arcade, billiards, a stadium-style live TV venue, live entertainment, and a captive casual dining restaurant/bar all under one roof.

7.     Additional details regarding the Debtors' businesses and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration, which was filed contemporaneously with this Motion and is incorporated by reference herein.

## B.     Organizational Structure

8.     Frank Entertainment Group, LLC ("FEG" or the "Borrower") is the ultimate parent of all of the other Debtors, including Frank Management, LLC the main operating / management company.   A more detailed organizational chart is annexed to the First Day Declaration.

## C.     The Debtors' Prepetition Capital Structure

(i)     Senior Loan Documents

9.     FEG, as Borrower, and the other Debtors, as guarantors (the "Subsidiary Guarantors"), are parties to a Credit Agreement dated June 20, 2014 (as amended, modified or

otherwise supplemented, the "Senior Credit Agreement"), and associated Loan Documents (as defined in the Senior Credit Agreement) (collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Senior Loan Documents") pursuant to which Elm Park Capital Management, LLC as Administrative Agent (in such capacity, the "Senior Agent") and the lenders that are parties thereto (in such capacity, the "Senior Lenders") extended a secured financing facility to FEG in the original principal sum of $21 million (the "Prepetition Loan Facility").  As of the Petition Date, approximately $31 million remains outstanding under the Prepetition Loan Facility, inclusive of $4,527,008 in Existing Protective Advances (the "Existing Protective Advances") authorized pursuant to the Senior Loan Documents (together with any amounts incurred or accrued, but unpaid prior to the Petition Date, the "Senior Indebtedness").  To secure the Senior Indebtedness, the Debtors granted the Senior Lenders first-priority security interests in, and liens on (the "Senior Liens"), all of their personal and real property (collectively, the "Senior Collateral"), subject only to certain permitted encumbrances.

       (ii)      Subordinated Loan Documents[3]

       10.      FEG, as Borrower, and the Subsidiary Guarantors, are parties to a Second Lien Credit Agreement dated May 17, 2017 (collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Subordinated Loan Documents"), pursuant to which Seacoast Capital Partners III, L.P. as Administrative Agent (the "Subordinated Agent") and the second lien lenders that are parties thereto (the "Subordinated Lenders") extended a subordinated secured financing facility to FEG in the original sum of $3 million (the "Subordinated Loan Facility").  As of the Petition Date, approximately $8 million remains outstanding under the Subordinated Loan Facility, authorized pursuant to the Subordinated Loan Documents (together with any amounts incurred or accrued, but unpaid prior to the Petition Date,

---

[3] The Senior Lenders and the Subordinated Lenders (defined herein) are parties to that certain Subordination and Intercreditor Agreement dated May 17, 2017.

the "Subordinated Indebtedness").   To secure the Subordinated Indebtedness, the Debtors granted to the Subordinated Lenders second-priority security interests in, and liens on (the "Subordinated Liens"), all of their personal and real property (the "Junior Collateral"), subject only to certain permitted encumbrances.

(iii)    Trade Debt

11.    As of the Petition Date, the Debtors have aggregate unsecured debts totaling approximately $5.3 million, which include amounts owed for merchandise, utilities, professional fees, rent, insurance, and employee-related expenses.    Of that amount, approximately $4.6 million constitutes trade vendor payables.

## NEED FOR USE OF CASH COLLATERAL
## AND POSTPETITION FINANCING

12.    The Debtors intend to use the Chapter 11 Cases to deleverage their balance sheets, restructure their debt obligations, and propose a feasible plan or reorganization (the "Plan")[4], the terms of which are incorporated into a Restructuring Support Agreement (the "RSA") entered into between and among FEG, the Subsidiary Guarantors, the Senior Agent, the Senior Lenders, the Subordinated Lenders, and the Securities Holders (as defined in the RSA). The Debtors intend to file a motion to assume the RSA within two days after the Petition Date. Pursuant to the RSA, the Plan must be filed within twenty eight days after the Petition Date. Pending the filing of a Plan, the Debtors intend to operate their businesses in the ordinary course by continuing to retain and pay their employees and provide high level service to their customers.

13.    The Debtors, however, do not have sufficient unencumbered cash or other assets to continue to operate their businesses during these Chapter 11 Cases or to effectuate the restructuring transactions provided for in the RSA.   The Debtors will be immediately and irreparably harmed if they are not granted the authority to use the cash collateral (the "Cash

---

[4] The Debtors may file a combined plan and disclosure statement, which is authorized under the RSA.

Collateral") of the Senior Lenders and Subordinated Lenders,[5] and to obtain postpetition financing from the DIP Lenders in accordance with the terms of the DIP Credit Agreement. Significantly, the Senior Lenders, owed more than $31 million, have refused to consent to the priming of their prepetition secured claims and the Debtors believe for a variety of reasons that a priming fight is not realistic due to the dire financial condition of the Debtors.  Accordingly, the relief sought herein is necessary in order to permit, among other things, the orderly continuation of the Debtors' businesses, the ability to fund payroll and payroll taxes, the maintenance of their relations with vendors and suppliers, satisfaction of their working capital needs, as well as the ability to pay taxes, and to pay for inventory, supplies, overhead, insurance and other necessary ordinary course expenses.  The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of new indebtedness under the DIP Facility, and other financial accommodations, is vital to the preservation and maintenance of the going concern value of the Debtors and to a successful reorganization of the Debtors pursuant to the terms of the RSA.

14.     While the Senior Lenders have continued to fund the Debtors' substantial cash shortfalls while the parties negotiated a consensual restructuring, the Senior Lenders have refused to make any additional new money advances without the protections afforded under the Bankruptcy Code.  Absent use of Cash Collateral and the additional funds provided by the DIP Financing, the Debtors project that they will run out of cash to operate within days.  In fact, in the days and weeks leading to the Petition Date, the Senior Lenders had to extend an additional $800,000 of Existing Protective Advances to preserve the value of the estate assets that are necessary for the reorganization (e.g., the payment of rent on certain cash flow positive properties, the funding of payroll, and required payments to film studios).  The Debtors require the continued use of Cash Collateral to fund their operations with any shortfall in funds provided for by the DIP Financing.  It is critical that the Debtors have sufficient funding to meet their

---

[5] Both the Senior Lenders and the Subordinated Lenders have consented to the Debtors use of cash collateral during these Chapter 11 Cases, consistent with the terms set forth herein.

ordinary course and bankruptcy-related administrative expense obligations in order to effectuate an orderly reorganization, especially in the crucial holiday/Christmas season. The Debtors believe that the DIP Financing, together with the continued use of Cash Collateral, will enable them to meet all of their obligations in these Chapter 11 Cases.

15.     Given the Debtors' existing capital structure and financial condition, they were unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors were also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the DIP Lenders, subject to the Carve Out (as defined in the Interim Order), the DIP Liens and the DIP Superpriority Claims under the terms and conditions set forth in the DIP Credit Agreement and Interim Order.

16.     After good faith arm's length negotiations with respect to the terms and conditions of the DIP Financing, and after making a reasonable effort to solicit proposals from other potential DIP lenders, the Debtors concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of the DIP Credit Agreement and the Interim Order clearly represents the most favorable – and due to their current financial issues likely only – terms and adequate source of financing presently available to the Debtors.

17.     The Debtors sought proposals for alternative financing from 12 sources of financing including hedge funds and private equity funds. However, not one of the proposed funding sources that was contacted made a proposal to provide alternative financing. This is likely due to the lack of equity in the Debtors' assets and operations, the fact that the Senior Lenders refused to consent to priming of their secured claims, and the fact that the DIP Financing being provided by the DIP Lenders does not come with any attendant fees.

18.     Thus, the Debtors submit that the terms of the proposed use of Cash Collateral and DIP Financing are fair, reasonable and balanced, reflect the Debtors' exercise of sound business judgment consistent with their fiduciary duties, are the best available under the

circumstances, supported by reasonably equivalent value and fair consideration, and should be approved on an interim and final basis.

## SUMMARY OF DIP FINANCING TERMS

19.    In accordance with the disclosure requirements of Bankruptcy Rule 4001(c) and Local Rule 4001-3, a summary of the material terms of the DIP Credit Agreement and Interim Order, including a description of each of the provisions required to be highlighted by such rules, are set forth in the chart below.[6]

| | |
|---|---|
| *Borrowers* | Frank Entertainment Group, LLC. |
| *DIP Lenders* | Elm Park Capital Management, LLC, as the DIP Agent.<br><br>Elm Park Credit Opportunities Fund, L.P.<br>Elm Park Credit Opportunities Fund (Canada), L.P.<br>Business Development Corporation of America<br>Benefit Street Partners SMA-K L.P.<br>Landmark Wall SMA L.P.<br>Benefit Street Partners Debt Fund IV L.P.<br>Benefit Street Partners Debt Fund IV Master (Non-US) L.P.<br>Benefit Street Partners SMA C L.P.<br>Benefit Street Partners SMA LM L.P.<br>Providence Debt Fund III Master (Non-US) L.P.<br>Providence Debt Fund III L.P. |
| *Subsidiary Guarantors* | Frank Theatres Bayonne/South Cove, LLC<br>Frank Theatres Rio, LLC<br>Frank Management, LLC<br>Frank Entertainment Rock Hill, LLC<br>Revolutions of Saucon Valley LLC<br>Frank Hospitality Saucon Valley LLC |

---

[6] The descriptions of the material terms of the proposed DIP Financing and Interim Order provided in this Motion are intended only as a summary thereof.  In the event of any inconsistency between the descriptions set forth herein and the terms of the DIP Credit Agreement and/or Interim Order, the terms of the DIP Credit Agreement and Interim Order shall govern. All capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the DIP Credit Agreement.  Sections that must be highlighted for the Court under either Bankruptcy Rule 4001(c) or Local Rule 4001-3 are in bold and references to the DIP Credit Agreement and Interim Order, where applicable, are provided.  Capitalized terms used in this chart that are not otherwise defined herein have the meanings ascribed to such terms in the DIP Credit Agreement.

| | |
|---|---|
| | Revolutions at City Place, LLC<br>Frank Entertainment PSL LLC<br>Frank All Star Theatres, LLC<br>Frank Theatres, LLC<br>Frank Theatres Montgomeryville, LLC<br>Frank Theatres Towne, LLC<br>Frank Theatres York, LLC<br>Frank Hospitality York, LLC<br>Galleria Cinema, LLC<br>Frank Theatres Delray, LLC<br>Frank Theatres Parkside Town Commons, LLC<br>Frank Theatres New Hill Place, LLC<br>Frank Theatres Kingsport LC<br>Frank Theatres Blacksburg LLC<br>Frank Theatres Mt. Airy, LLC<br>Frank Theatres Southern Pines, LLC<br>Frank Theatres Sanford, LLC<br>Frank Theatres Shallotte, LLC |
| *Commitment, Availability and Purpose* | The DIP Financing shall be a delayed draw term loan facility of up to $5,500,000 for which the DIP Lenders will receive protection under Sections 364(c) and 364(d) of the Bankruptcy Code. $1,000,000 of the DIP Financing will be delivered to the Borrower, for the benefit of all of the Debtors, to be used by the Debtors solely in accordance with the Interim Order and the Approved Budget (the "<u>Interim Amount</u>").  On or after the date the Final Order is entered, or the Business Day immediately succeeding such day, the Borrower may draw on one or more occasions, additional amounts under the DIP Loan to be used solely in accordance with the Initial Order, Final Order, and the Approved Budget, and the other provisions of the DIP Credit Agreement.<br><br>DIP Credit Agreement §§2.1 and 3.3; Interim Order (Recital Section). |
| *Term and Maturity* | The maturity date (the "<u>Maturity Date</u>") means the earlier of (a) 30 days from the Petition Date, unless the Final Order has been entered by the Bankruptcy Court on or prior to such date, (b) the effective date of the Plan of Reorganization, or (c) 120 days from the Petition Date.<br><br>DIP Credit Agreement §1 (definition of Maturity Date). |

| | |
|---|---|
| *Interest Rate, Payments, Fees and Expenses* | **Interest Rate**:  LIBOR + 9%  (accrued but not cash paid)<br><br>**Default Rate**:  In the event of a default by the Debtors as specified in the DIP Credit Agreement, the interest rate charged will be the Interest Rate <u>plus</u> 2 basis points.<br><br>**Interest Calculation.** Interest payable pursuant to the DIP Credit Agreement will be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.<br><br>**No Fees**:  The DIP Financing does not include the payment of any upfront or exit fees.<br><br>DIP Credit Agreement § 2.6. |
| *DIP Budget and Use of Proceeds* | The Debtors shall be permitted to use proceeds of the DIP Facility solely in accordance with the terms of a budget that is acceptable to the DIP Lenders, subject to disbursements for any period of time measured from the Petition Date not exceeding 110% of the amounts set for in the Approved Budget for the corresponding time period.   The initial Approved Budget is attached to the Interim Order.<br><br>Notwithstanding the foregoing, proceeds of the DIP Facility shall be used solely for the following purposes (to the extent identified in any Approved Budget):   (a) to fund post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 959; (b) to pay interest, fees and expenses to the DIP Lenders in accordance with the DIP Facility (whether or not such amounts are reflected in any Approved Budget); (c) to fund fees and expenses incurred in connection with the Chapter 11 Cases; (d) to pay permitted pre-petition claim payments and adequate protection payments, if any; and (e) to pay certain other costs and expenses of administration of the Chapter 11 Cases.<br><br>Aside from $15,000 (the "<u>Challenge Budget</u>"), no proceeds of the DIP Facility shall not be used to:  (a) permit the Debtors, or any other party-in-interest or their representatives, to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests granted in favor of the Senior Lenders under the Senior Loan Documents, the DIP Lenders under the DIP Financing Documents, or the Subordinated Lenders under the Subordinated Loan Documents, or (ii) the |

<table>
<tr>
<td></td>
<td>

enforceability of the obligations of the Debtors or any guarantor under the Senior Loan Documents, the DIP Financing Documents, or Subordinated Loan Documents, or (b) investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against the Senior Lenders, DIP Lenders, Subordinated Lenders, or their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims relating in any way to the Debtors, the Senior Loan Documents, the Subordinated Loan Documents, and/or the DIP Financing, or (c) fund acquisitions, dividends or distributions, employee or management bonuses, capital expenditures, capital leases, or any other similar expenditure, except as set forth in any Approved Budget.

DIP Credit Agreement §§3.7 and 7.2.

</td>
</tr>
<tr>
<td>

*Conditions Precedent to Closing and Funding*

</td>
<td>

The closing of the DIP Financing shall be subject to conditions precedent customary and appropriate for financings of this type, including, but not limited to:

a) With respect to the Interim DIP Facility, the Interim Order shall be entered and in full force and effect and shall not have been appealed, stayed, reversed, vacated or otherwise modified without the consent of the Required Lenders and, with respect to the Final DIP Facility, the Final Order shall be entered and in full force and effect and shall not have been appealed, stayed, reversed, vacated or otherwise modified without the consent of the Required Lenders;

- The Interim Order and Final Order (a) shall authorize and approve the transactions contemplated by the Loan Documents, (b) shall find that the Lenders are extending credit to the Borrower in good faith within the meaning of Bankruptcy Code section 364(e), and (c) shall set forth provisions (i) approving in all respects the Loan Documents, and authorizing and directing the Debtors to execute and become bound by the Loan Documents; (ii) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the Interim Order and the Loan Documents, including to permit the creation and perfection of the Agent's and Lenders' Liens on the Collateral; (iii) providing for the automatic relief of such stay to permit the enforcement of the

</td>
</tr>
</table>

Agent's and Lenders' remedies under the Loan Documents, subject to the right of the Debtors and/or the Committee to seek to re-impose or continue the automatic stay; and (iv) providing that the Debtors acknowledge and stipulate to (x) the validity and enforceability of the Prepetition Obligations, without defense, offset or counterclaim of any kind, (y) the validity, perfection Liens and priority of the Prepetition Liens, and that the Debtors waive any right to challenge or contest such claims and liens, and (z) that the Debtors have no valid offset rights, claims or causes of action, whether based in contract, tort or otherwise against the Lenders with respect to the Prepetition Loan Documents or the related transactions or that otherwise which would impair, in any manner, the Agent's and Lenders' liens against the Debtors' assets or the obligations of the Debtors arising under the Prepetition Loan Documents.

b) Agent and the Lenders shall have received each of the following documents, in form and substance satisfactory to the Agent and the Required Lenders, duly executed and delivered, and each such document shall be in full force and effect:

- the DIP Credit Agreement;

- the Subsidiary Guaranty; and

- the Approved Budget;

c) Agent and the Lenders shall have received evidence that appropriate financing statements have been duly filed in such office or offices as may be necessary or, in the reasonable opinion of Agent, desirable to perfect the Agent's Liens in and to the Collateral;

d) Agent and the Lenders shall have received evidence of the entry by the Bankruptcy Court of all "first day orders" entered at or about the time of the commencement of the Chapter 11 Cases each in form and substance reasonably satisfactory to the Agent and the Required Lenders;

e) The Debtors shall continue to employ the cash management system that existed as of the Petition Date, as modified or approved by the Bankruptcy Court;

f) The Borrower shall have retained and shall have continued to employ the Chief Restructuring Officer and Management

Consultant;

g) All Indebtedness of the Loan Parties shall have been subordinated to the Indebtedness to the Lenders under this Agreement on terms and conditions satisfactory to Required Lenders;

h) The Agent and the Lenders shall have received all requested financial information regarding the Loan Parties, including the Approved Budget, to be in form, scope and substance acceptable to Agent and the Required Lenders and in the form attached hereto as Exhibit A;

i) All Liens created pursuant to the Loan Documents shall have been duly perfected and registered in all relevant jurisdictions;

j) Agent and the Lenders shall have received a certificate from the Chief Restructuring Officer of each Loan Party (i) attesting to the resolutions of such Loan Party's board of directors authorizing its execution, delivery, and performance of the Loan Documents to which it is a party and authorizing specific officers of such Loan Party to execute the same, and (ii) attesting to the incumbency and signatures of the Chief Restructuring Officer;

k) Agent and the Lenders shall have received copies of each Loan Party's Governing Documents, as amended, modified, or supplemented prior to the Petition Date, which Governing Documents shall be (i) certified by the Chief Restructuring Officer of such Loan Party, and (ii) with respect to Governing Documents that are charter documents, certified as of a recent date (not more than 30 days prior to the Petition Date) by the appropriate governmental official;

l) Agent and the Lenders shall have received a certificate from the Borrower's insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.7 of the DIP Credit Agreement is in full force and effect, together with endorsements naming the Agent as additional insured and loss payee thereunder;

m) Agent and the Lenders shall have received an opinion of the Loan Parties' counsel in form and substance satisfactory to Agent and the Required Lenders;

n) Agent shall have completed its business, financial and legal due diligence of the Loan Parties, including but not limited to (i) review of material agreements, (ii) a collateral audit, (iii) UCC, tax lien and litigation searches, and (iv) review of

|  | the Loan Parties books and records, the results of which are satisfactory to the Agent and Lenders; |
|  | o) Unless waived by the Lenders, the Borrower shall have paid all Lender Group Expenses incurred in connection with the transactions evidenced by this Agreement and the other Loan Documents; |
|  | p) Each Loan Party shall have received all governmental and third party approvals (including shareholder approvals and other consents) necessary or, in the reasonable opinion of the Required Lenders, advisable in connection with this Agreement, the transactions contemplated by the Loan Documents, which shall all be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on this Agreement, the transactions contemplated by the Loan Documents; and |
|  | q) all other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Agent and the Required Lenders. |
|  | DIP Credit Agreement §3. |
| *Collateral and Lien Priority* | As security for the DIP Obligations, effective and perfected upon the date the Interim Order is entered and without the necessity of the execution, recordation, or filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Lenders, the DIP Lenders shall be granted the following valid, binding, enforceable non-avoidable and automatically perfected security interests in, and liens on, all of the DIP Collateral pursuant to an Interim Order, the Final Order, and the other DIP Financing Documents. |
|  | **DIP Liens.**  Claims in respect of the DIP Facility shall be accorded superpriority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code and be secured by a first-priority security interest (the "<u>DIP Liens</u>") in all of the Debtors' assets, including, without limitation, all of the Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort |

| | |
|---|---|
| | claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtors (collectively, the "DIP Collateral") pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code; provided, however, that until entry of the Final Order, the DIP Collateral shall not include any avoidance actions available to the bankruptcy estate of any Debtors (other than actions under Section 549) pursuant to the Bankruptcy Code or the proceeds thereof.<br><br>DIP Credit Agreement § 5.3(b); Interim Order ¶2(h).<br><br>**Adequate Protection Liens.**  As adequate protection for the Debtors' use of Cash Collateral, the Senior Lenders will be granted adequate protection liens in all of the Debtors' assets, junior only to the DIP Liens (the "Senior Adequate Protection Liens"), to the extent of diminution in value of the Senior Lenders' collateral under the Senior Loan Documents.<br><br>Interim Order ¶3(a).<br><br>**Subordinated Adequate Protection Liens.**  As adequate protection for the Debtors' use of cash collateral, the Subordinated Lenders will be granted adequate protection liens in all of the Debtors' assets, junior only to the DIP Liens and the Adequate Protection Liens (the "Subordinated Adequate Protection Liens"), to the extent of diminution in value of the Subordinated Lenders' collateral under the Subordinated Loan Documents.<br><br>Interim Order ¶3(c). |
| *Superpriority Administrative Expense Claims* | **Superpriority Administrative Expense Claim**<br><br>Subject to the Carve Out, amounts owed by the Debtors to the DIP Lenders pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses, as applicable) shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, an allowed claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code (the "DIP Superpriority Claim").<br><br>DIP Credit Agreement § 5.31; Interim Order ¶2(i). |

| | |
|---|---|
| | **Adequate Protection Superpriority Claims.**<br><br>To the extent the Adequate Protection Liens do not adequately protect against the diminution in value of the Senior Collateral, the Senior Lenders shall also be given a postpetition superpriority administrative expense claim against each Debtor, jointly and severally, with recourse to all pre- and postpetition property and all proceeds thereof pursuant to Sections 503 and 507 of the Bankruptcy Code, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter and over all other administrative expenses of any kind, including, without limitation, those specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114, or otherwise, and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Section 1112 (the "Senior Adequate Protection Priority Claim").<br><br>Interim Order ¶3(b).<br><br>To the extent the Subordinated Adequate Protection Liens do not adequately protect against the diminution in value of the Junior Collateral, the Subordinated Lenders shall also be given a postpetition administrative expense claim against each Debtor, jointly and severally, with recourse to all pre- and postpetition property and all proceeds thereof pursuant to Sections 503 and 507 of the Bankruptcy Code, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter and over all other administrative expenses of any kind, including, without limitation, those specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Section 1112 (the "Subordinated Adequate Protection Priority Claim"); provided, however, that the Subordinated Adequate Protection Priority Claim shall be subject, and junior in all respects, to the DIP Superpriority Claim and the Senior Adequate Protection Priority Claim.<br><br>Interim Order ¶3(d). |
| *Reporting Requirements* | The reporting requirements are set forth in §5 of the DIP Credit Agreement. |

| | |
|---|---|
| *Events of Default* | Upon the occurrence of an Event of Default contained in the DIP Credit Agreement, the DIP Lenders may declare all DIP Obligations owing under the DIP Facility to be immediately due and payable, and may declare a termination of any further obligation to extend credit to the Debtors and exercise all other remedies as set forth in the section 8 of the DIP Credit Agreement.<br><br>Defaults and Events of Default customarily included in debtor-in-possession financing agreements, including, without limitation:<br><br>a) **Payments** - If the Borrower fails to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations, or (b) all or any portion of the principal of the Loans, and in each case such default is not cured within five (5) Business Days of any such failure;<br><br>b) **Covenants.** If any Loan Party or any of its Subsidiaries fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, and such failure continues for a period of 5 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Loan Party and (ii) the date on which written notice thereof is given to the Borrower by Agent or any Lender;<br><br>c) **Assets**. If any material portion of the Borrower's or any Subsidiary's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person and the same is not discharged before the earlier of 30 days after the date it first arises or 5 days prior to the date on which such property or asset is subject to forfeiture by the Borrower or such Subsidiary, as the case may be;<br><br>d) **Voluntary Bankruptcy.** If an Insolvency Proceeding, other than the Chapter 11 Cases, is commenced by a Loan Party or any of its Subsidiaries (other than any voluntary liquidation, wind up or dissolution permitted under Section 6.3(b); |

e) **Involuntary Bankruptcy.**  If an Insolvency Proceeding, other than the Chapter 11 Cases, is commenced against a Loan Party or any of its Subsidiaries and any of the following events occur: (a) such Loan Party or such Subsidiary consents to the institution of such Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted, (c) the petition commencing the Insolvency Proceeding is not dismissed within 60 calendar days of the date of the filing thereof, (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, such Loan Party or its Subsidiary, or (e) an order for relief shall have been issued or entered therein;

f) **Business Affairs.**  If the Borrower or any Subsidiary is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; <u>provided</u> that any such court order shall not constitute an Event of Default so long as, and solely during the period in which, such court order is stayed pending appeal;

g) **Judgments.**  If one or more judgments, orders, or awards for the payment of money involving an aggregate amount of $100,000 or more (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has accepted liability therefore in writing) is entered or filed against the Borrower or any Subsidiary, or with respect to any of their respective assets, and either (a) there is a period of 30 consecutive days at any time after the entry of any such judgment, order, or award during which (1) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (2) a stay of enforcement thereof is not in effect, or (b) enforcement proceedings are commenced upon such judgment, order, or award;

h) **Default Under Other Agreements.**  If there is a default in (a) any Equity Document, (b) any Lease in respect of a Leasehold Property, except in connection with the rejection of such Lease under the Bankruptcy Code, or (c) one or more agreements to which the Borrower or any Subsidiary is a party with one or more third Persons relative to the Borrower's or such Subsidiary's, as the case may be,

Indebtedness involving an aggregate amount of $250,000 or more, and, in each case, such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in the acceleration of the maturity of the Borrower's or such Subsidiary's, as the case may be, obligations thereunder;

i) **Representations, etc.** If any warranty, representation, certificate, statement, or Record made herein or in any other Loan Document or delivered to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

j) **Guaranty.** If the obligation of any Subsidiary Guarantor under the Subsidiary Guaranty is limited or terminated by operation of law or by such Subsidiary Guarantor, or any such Subsidiary Guarantor becomes the subject of an Insolvency Proceeding other than the Chapter 11 Cases;

k) **Security Documents.** If the Security Agreement, any Leasehold Mortgage or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected, first priority Lien on the Collateral covered thereby, except as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement;

l) **Loan Documents.** The validity or enforceability of any Loan Document shall at any time for any reason be declared to be null and void, or a proceeding shall be commenced by a Loan Party or its Subsidiaries, or by any Governmental Authority having jurisdiction over a Loan Party or its Subsidiaries, seeking to establish the invalidity or unenforceability thereof, or a Loan Party or its Subsidiaries shall deny that such Loan Party or its Subsidiaries has any liability or obligation purported to be created under any Loan Document;

m) **Change of Control.** A Change of Control shall occur, whether directly or indirectly;

n) **ERISA Event.** An ERISA Event occurs with respect to a

Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of the Borrower or any Subsidiary to a Pension Plan, Multiemployer Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Pension Plan or Multiemployer Plan; the Borrower or a Subsidiary or ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; or any event similar to the foregoing occurs or exists with respect to a Foreign Plan;

o) **Milestones.**   The Debtors fail to satisfy any of the Milestones in the Chapter 11 Cases;

p) **Restructuring Advisors.**  The Chief Restructuring Officer or the Management Consultant cease to be employed or retained by the Debtors without the written consent of the Required Lenders;

q) **Chapter 11 Cases**.   Any of the Chapter 11 Cases is converted to a case under Chapter 7 of the Bankruptcy Code or is dismissed or a motion requesting such relief shall have been granted;

r) **Plan of Reorganization**.   The Debtors file or support a proposed plan of reorganization, other than the Plan of Reorganization contemplated by the RSA, that (i) does not provide for the indefeasible payment in full and in cash of the Prepetition Obligations and the Obligations under the Loan Documents on the effective date of such plan or (ii) is not otherwise acceptable to the Required Lenders in their sole discretion;

s) **Sale of Assets**.  The Debtors file, or fail to timely oppose, a motion seeking the sale of all or substantially all of the Debtors' assets without the prior written consent of the Required Lenders;

t) **Appointment of Trustee**.  Appointment of a trustee under Section 1104 of the Bankruptcy Code or an examiner under Section 1106 of the Bankruptcy Code without the express written consent of the Required Lenders, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose;

u) **DIP Financing**. Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the terms of this Agreement, the Interim Order, or the Final Order without the prior written consent of the Required Lenders or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose;

v) **Claims and Liens**. Any attempt by any Debtors to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment invalidating, reducing, or otherwise impairing the Agent's and Lenders' claims, or to subject any of the Collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code;

w) **Collateral**. Any Debtor shall apply for an order of the Bankruptcy Court substituting any assets for all or any portion of the Collateral, except as provided in the Loan Documents;

x) **Prepetition Claims**. Any payment on, or application for authority to pay, any pre-petition general unsecured claim in the Chapter 11 Cases without prior written consent of the Required Lenders;

y) **Solicitation and Confirmation**. The Debtors take any action that results (or fail to take any action that could reasonably be expected to result) in the interruption or cessation of the solicitation and confirmation of the Plan of Reorganization in the Chapter 11 Cases;

z) **Automatic Stay**. An order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay;

aa) **Postpetition Indebtedness**. Failure to pay any material, undisputed post-petition indebtedness within 45 days of the date on which such indebtedness becomes due and owing;

bb) **Exclusivity**. Exclusivity shall have been terminated or the Debtors shall have agreed to any such termination.

DIP Credit Agreement §8; Interim Order ¶14.

| *506(c) Waiver* | Upon entry of the Final Order, neither the Debtors nor any other |

| | |
|---|---|
| | person shall assert a claim under section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lenders, Senior Lenders or Subordinated Lenders upon the DIP Collateral, the Prepetition Collateral or the collateral subject to the Adequate Protection Liens or for any expenses of the administration of the estates.  Interim Order ¶9. |
| *Carve Out* | "Carve Out" means, collectively, the sum of:<br><br>a)  all allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for statutory fees payable to the Office of the United States Trustee, together with the statutory rate of interest, or by final order of the Court, and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Court;<br><br>b)  all fee accruals allowed at any time by the Court and incurred by professionals retained by the Debtors or the Committee, if any, in accordance with a final order of the Court (which order has not been reversed, vacated or stayed) under sections 327, 328 or 1103 of the Bankruptcy Code (the "Professionals") through the date of service by the DIP Lenders of a notice of event of default under the DIP Credit Agreement (the "Carve Out Trigger Notice"), up to and as limited by the respective aggregate amounts for each Professional included in the Approved Budget through the date of service of such Carve Out Trigger Notice, less the amount of prepetition retainers received by such Professionals and not previously applied to the fees and expenses of such Professionals;<br><br>c)  all accrued and unpaid fees, disbursements, costs and expenses incurred by the Professionals from and after the date of service by the DIP Agent of a Carve Out Trigger Notice, to the extent allowed at any time by the Court, in an aggregate amount not to exceed $25,000 (the "Carve Out Cap"), less the amount of prepetition retainers received by such Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above.<br><br>The Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees, disbursements, costs or expenses of the Professionals made after the date of service by the DIP Lenders of |

| | the Carve Out Trigger Notice.  No portion of the Carve Out, nor any Cash Collateral or proceeds of the DIP Facility may be used in violation of this Interim Order.  Any unused portion of the Carve Out shall at all times remain Cash Collateral as provided herein and shall be applied in accordance with paragraph 12 of this Interim Order.  The DIP Liens are deemed to attach to the Debtors' residual interest in such funds. |
| | Interim Order ¶8. |
| *Credit Bidding* | Following entry of the Final Order, the DIP Lenders will have the right to credit bid, subject to section 363(k) of the Bankruptcy Code or applicable law, the DIP Loan, in whole or in part, in connection with any plan, sale, or other disposition of assets in the Chapter 11 Cases. |
| | DIP Credit Agreement §16.12; Interim Order ¶13. |
| *Relief from Automatic Stay* | **Modification of Automatic Stay**.  The automatic stay provisions of section 362 of the Bankruptcy Code are modified and lifted to the extent necessary to implement the provisions of the Interim Order and the DIP Credit Agreement to permit the creation and perfection of the DIP Liens. |
| | Interim Order ¶5. |
| | **Remedies.** |
| | Upon the Termination Date, the DIP Lenders shall have customary remedies, including, without limitation, the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court; <u>provided</u>, <u>however</u>, that the DIP Lenders shall provide the Debtors, Subordinated Lenders, any official committee appointed in the Chapter 11 Cases and the Office of the United States Trustee with five (5) days prior written notice of the DIP Lenders' intent to exercise such remedies.  Relief from the stay in favor of the DIP Lenders under Section 362 shall be embodied in any order approving the DIP Financing and the use of cash collateral. |
| | DIP Credit Agreement §9.1; Interim Order ¶14. |

| | |
|---|---|
| *Valid Liens, Debtors Stipulations, and Challenge Issues* | All liens authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the DIP Facility or with respect to adequate protection shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.<br><br>The stipulations contained in the Interim Order shall be binding upon the Debtors in all circumstances upon entry of the Interim Order.  Nothing in the Interim Order or the DIP Loan Documents shall prejudice whatever rights the Committee or any other party in interest (other than the Debtors), including any trustee subsequently appointed under chapter 7 or chapter 11 of the Bankruptcy Code, may have to (a) object to or challenge the findings herein, including, but not limited to, those in relation to (i) the validity, extent, perfection or priority of the security interests and liens of the Senior Lenders in and to the Senior Collateral or the Subordinated Lenders in and to the Junior Collateral, or (ii) the validity, allowability, priority, status or amount of the Senior Indebtedness or Subordinated Indebtedness, or (b) bring suit against the Senior Lenders or Subordinated Lenders in connection with or related to the Senior Indebtedness or Subordinated Indebtedness, respectively, or the actions or inactions of the Senior Lenders or Subordinated Lenders, whether arising out of or related to the Senior Indebtedness or Subordinated Indebtedness, respectively, or otherwise; provided, however, that, unless any Committee or any other party in interest obtains the requisite standing to commence, and commences, a contested matter or adversary proceeding raising such objection or challenge, including without limitation any claim against the Senior Lenders or Subordinated Lenders in the nature of a setoff, counterclaim or defense to the Senior Indebtedness or Subordinated Indebtedness (including but not limited to, those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Senior Lenders or Subordinated Lenders), by the later of (a) with respect to any Committee, sixty (60) calendar days following the appointment of such Committee or (b) if no Committee is appointed, with respect to other parties in interest with requisite standing, seventy-five (75) calendar days after the Petition Date (collectively, (a) and (b) shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "Challenge Period Termination Date").<br><br>Any party-in-interest that fails to file an adversary proceeding or |

| | |
|---|---|
| | contested matter challenging the Senior Lenders' or Subordinated Lenders' prepetition liens or claims, or otherwise asserting estate claims against the Senior Lenders or Subordinated Lenders within the Challenge Period shall be forever barred from asserting any claims against the Senior Lenders or Subordinated Lenders on behalf of the Debtors' estates or challenging in any manner the Senior Lenders' or Subordinated Lenders' liens and claims against the Debtors.<br><br>DIP Credit Agreement §4.5; Interim Order ¶7. |
| *Avoidance Actions* | Upon entry of the Final Order, the DIP Collateral shall include any avoidance actions available to the bankruptcy estate of any Debtors (other than actions under Section 549) pursuant to the Bankruptcy Code or the proceeds thereof.<br><br>DIP Credit Agreement §5.31(b); Interim Order ¶2(h). |
| *Roll Up of Existing Protective Advances* | Upon entry of the Final Order, all Existing Protective Advances outstanding under the Senior Loan Documents (and as defined therein) shall be deemed obligations under the DIP Facility.<br><br>Dip Credit Agreement § 2.2(a); Interim Order ¶2(c). |
| *Indemnification* | The indemnification provision is set forth in §11.3 of the DIP Credit Agreement. |
| *Case Milestones* | The Debtors shall be required to comply with the following timeline in the Chapter 11 Cases (the "Case Milestones"):<br><br>(i)      Commencement of the Chapter 11 Cases.   On or before December 19, 2018, each Debtor shall commence the Chapter 11 Cases by filing with the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.<br><br>(ii)      DIP Financing.   Within two (2) Business Days of the Petition Date, the Debtors shall file a motion with the Bankruptcy Court requesting approval of the DIP Financing on interim and final bases.<br><br>(iii)      Assumption and Approval of the RSA.   Within two (2) Business Days of the Petition Date, the Debtors shall file a motion |

|   | with the Bankruptcy Court requesting the assumption, approval, and authorization to perform the terms of the RSA.

(iv)   Interim Approval of DIP Financing.   Within five (5) Business Days of the Petition Date, the Bankruptcy Court shall have entered the Interim Order.

(v)   Filing of the Plan and Disclosure Statement. Within twenty-eight (28) days of the Petition Date, the Debtors shall file a Plan and accompanying disclosure statement (the "Disclosure Statement") (a combined plan and disclosure statement are acceptable) with the Bankruptcy Court implementing the restructuring as set forth in the Plan Term Sheet and consistent with the terms of the DIP Credit Agreement.

(vi)   Final Approval of DIP Financing.  Within twenty-eight (28) days of the Petition Date, the Bankruptcy Court shall have entered the Final Order.

(vii)   Approval of Disclosure Statement.   Within forty-five (45) days of the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and associated procedures for the solicitation of the Plan.

(viii)   Confirmation of the Plan. Within seventy-five (75) days of the Petition Date, the Bankruptcy Court shall have held a hearing to consider confirmation of the Plan and, within eighty (80) days of the Petition Date, the Bankruptcy Court shall have entered an order confirming the Plan (the "Confirmation Order").

(ix)   Effective Date of Plan.   Within ninety (90) days of the Petition Date, the effective date of the Plan shall have occurred (the "Plan Effective Date").

DIP Credit Agreement §1 (definition of Milestones). |

## **RELIEF REQUESTED**

20.   By this Motion, the Debtors seek entry of the DIP Orders granting the following relief:

a) authorizing and approving the Debtors' entry into the DIP Credit Agreement and performance of such other acts as may be necessary or appropriate in connection

therewith, to obtain up to $5,500,000 of secured postpetition loans and advances pursuant
to the DIP Orders, of which $1,000,0000 will be available upon entry of the Interim
Order;

b)  authorizing the Debtors use of the Cash Collateral of the Senior Lenders and the
    Subordinated Lenders pursuant to section 363 of the Bankruptcy Code;

c)  granting the Adequate Protection Liens and the Adequate Protection Superpriority Claims
    to the Senior Lenders and the Subordinated Lenders pursuant to sections 361 and 363 of
    the Bankruptcy Code;

d)  granting the DIP Lenders the DIP Liens (subject to the Carve Out) in and upon the DIP
    Collateral pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code;

e)  granting an allowed DIP Superpriority Claim to the DIP Lenders pursuant to section
    364(c)(1) of the Bankruptcy Code;

f)  Approval of the Roll Up of the Existing Protective Advances;

g)  authorizing the Subsidiary Guarantors to enter into that certain Guaranty, dated as of
    December 19, 2018, by and among the Subsidiary Guarantors that are parties thereto and
    the DIP Agent, a true and correct copy of which is attached to the Interim Order;

h)  waiving, upon entry of the Final Order, the rights of the Debtors to surcharge the DIP
    Collateral, Senior Collateral and Junior Collateral under section 506(c) of the Bankruptcy
    Code;

i)  vacating and modifying the automatic stay to the extent necessary to effectuate the terms
    and provisions of the DIP Credit Agreement and the DIP Orders; and

j)  scheduling the Final Hearing to consider entry of the Final Order.

## **BASIS FOR RELIEF**

21.    The Debtors do not have sufficient unencumbered cash or other assets to
continue to operate their businesses during these Chapter 11 Cases or to effectuate a
reorganization consistent with the terms of the RSA.  The Debtors will be immediately and

irreparably harmed if they are not granted the authority to use the Cash Collateral of the Senior Lenders and Subordinated Lenders and to obtain postpetition financing from the DIP Lenders in accordance with the terms of the DIP Credit Agreement in order to permit, among other things, the orderly continuation of their businesses, the ability to fund payroll and payroll taxes, the maintenance of their relations with vendors and suppliers, satisfaction of their working capital needs, as well as the ability to pay taxes, to pay for inventory, supplies, overhead, insurance and other necessary expenses.  The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of new indebtedness under the DIP Facility and other financial accommodations, is vital to the preservation and maintenance of the going concern value of the Debtors and to a successful reorganization of the Debtors.

22.    Further, despite reasonable efforts, including reaching out to at least 12 alternative financing sources, the Debtors have been unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Credit Agreement and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  This is likely due to the lack of equity in the Debtors' assets and operations, the fact that the Senior Lenders refused to consent to priming of their prepetition secured claims, and how the DIP Financing being provided by the DIP Lenders does not come with any associated fees.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the DIP Lenders, subject to the Carve Out, the DIP Liens and the DIP Superpriority Claims under the terms and conditions set forth in this Interim Order and in the DIP Credit Agreement.  Significantly, the Senior Lenders and Subordinated Lenders voluntarily consented under the RSA to granting the DIP Lenders the DIP Liens pursuant to section 364(d)(1) of the Bankruptcy Code.

23.    In the absence of sufficient funds to support the Debtors' ongoing operations, the value of the Debtors' assets and operations will dissipate, jeopardizing their ability to maximize value to the detriment of the Debtors' estates, creditors and all other parties

-30-

in interest. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 885 (Bankr. W.D. Mo. 2003) (approving postpetition financing where it "gives the Debtors sufficient time to market and sell several of their major assets so as to pay down the debt to the DIP Lenders and then reorganize around their remaining core assets [and where] [w]ithout the continued financing, the Debtors would likely be forced into a chapter 7 or 11 liquidation, to the detriment of all creditors . . ."). Thus, the continued use of Cash Collateral and the DIP Financing are in the best interests of the Debtors' estates, creditors and all other stakeholders and, therefore, should be approved by this Court.

I.   **The Proposed DIP Financing Should be Approved Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code**

24.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c). The Debtors propose to obtain the DIP Financing by providing the DIP Lenders, *inter alia*, the DIP Liens and the DIP Superpriority Claims pursuant to sections 364(c)(1)–(2) and 364(d)(1) of the Bankruptcy Code.

25.    In seeking to obtain post-petition financing under section 364(c) of the Bankruptcy Code, the Debtors have the burden of demonstrating that:

(1)    They are unable to obtain unsecured credit pursuant to 11 U.S.C. § 364(b), *i.e.*, by allowing a lender only an administrative expense claim pursuant to 11 U.S.C. § 503(b)(1)(A);

(2)    The credit transaction is necessary to preserve the assets of the estate; and

> (3) The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Los Angeles Dodgers, LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011). *See also In re Aqua Assocs.*, 132 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). Further, section 364(d) of the Bankruptcy Code provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if the debtor is unable to obtain such credit otherwise and there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d). As noted above, the Senior Lenders and Subordinated Lenders consent to granting the DIP Lenders the DIP Liens pursuant to section 364(d)(1) of the Bankruptcy Code. Furthermore, the Debtors submit that the interests of the Senior Lenders and Subordinated Lenders are adequately protected by the continued maintenance of the Debtors' property that will be facilitated by the use of Cash Collateral and the DIP Financing. Absent the use of Cash Collateral and the DIP Financing, the Debtors will not have adequate funds to maintain their property thereby diminishing the value of their lenders' collateral.

26. For the reasons set forth herein, the Debtors submit that they have satisfied the standards required to access postpetition financing under section 364(c) and 364(d) of the Bankruptcy Code.

### A. The Debtors were Unable to Obtain DIP Financing on More Favorable Terms

27. The Court may not approve a credit transaction under section 364(c) unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b). *In re Los Angeles Dodgers, LLC*, 457 B.R. at 313 (citing *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990)). To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *See Bray v.*

*Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  The statute does not impose a duty to seek credit from "every possible lender before concluding that such credit is unavailable." *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (citing *In re Snowshoe Co*., 789 F.2d at 1088).

28.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).  *See also In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames,* 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

29.     Given the Debtors' prepetition capital structure and valuation underlying the RSA (e.g., how the recoveries agreed to after several months of lengthy negotiations, subject to confirmation of the Plan, by the Senior Lenders and Subordinated Lenders are significantly less than 100% of the value of their respective claims), they have been unable to procure any financing in the form of unsecured credit allowable as an administrative expense claim under section 503(b)(1) of the Bankruptcy Code.  The Debtors face severe liquidity constraints because the Senior Lenders will not make any additional new money advances outside of bankruptcy, and were consequently forced to file these Chapter 11 Cases in order to preserve the value of their assets for the benefit of their creditors, and other parties in interest.  Significantly, if the DIP Financing is not approved, the Debtors and their stakeholders would not be able to benefit from the box office receipts in the extremely important Christmas season, to the detriment of all their stakeholders.

30.     As explained above, the Debtors sought proposals for alternative financing and not one party that was contacted made an offer to provide alternative financing, likely due to the fact that the Senior Lenders would not voluntarily agree to the priming of the prepetition

-33-

claims and how the proposed DIP Financing does not include any fees.  Unless the Debtors are able to immediately access postpetition financing on a secured basis through the DIP Financing, the Debtors will run out of cash shortly after the Petition Date and will not be able to pay employees, insurance and other necessary and critical expenses needed to maintain and maximize the value of the Debtors' assets, including critical rents and payments to film studios.  Indeed, absent the use of Cash Collateral and the DIP Financing, the Debtors would be forced to immediately suspend or terminate operations which, the Debtors submit, would no doubt result in the diminution of value of the Debtors' assets, result in the loss of approximately 694 jobs, and hurt all of the Debtors' creditors.  By contrast, approval of the DIP Financing will allow the Debtors to continue to operate in the ordinary course, maintain and maximize the value of their assets, instill confidence in the Debtors' employees and customers, and permit the Debtors the opportunity to adequately assess restructuring options in the near term and propose a feasible chapter 11 plan consistent with the terms of the RSA.

31.    As it stands, the DIP Lenders have provided the Debtors with the most favorable and flexible post-petition financing terms that the Debtors have been able to procure. Accordingly, the Debtors submit that their efforts to obtain sufficient postpetition financing on the most favorable terms available satisfies the standard required under section 364(c) and 364(d) of the Bankruptcy Code.

**B.    The DIP Financing is Necessary to Preserve the Debtors' Assets and Going Concern Value**

32.    As debtors-in-possession, the Debtors have a fiduciary duty to protect and maximize the value of their estates' assets.  *See Burtch v. Ganz (In re Mushroom Transp. Co.),* 382 F.3d 325, 339 (3d Cir. 2004).  As noted above, without the DIP Financing, there is a significant risk that the Debtors would be forced to shut down operations and immediately liquidate their assets.  *See e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R.

at 38 (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").

33.     As explained herein, the Debtors require access to funds in the form of postpetition financing to continue to operate in the ordinary course, meet their chapter 11-related obligations, and reorganize their operations in accordance with the RSA.  Accordingly, the DIP Financing is necessary to preserve the Debtors' assets and the going concern value of the Company.

### C.     The Terms of the DIP Financing are Fair, Reasonable, and Appropriate Under the Circumstances

34.     In considering whether the terms of proposed debtor-in-possession financing are fair and reasonable, courts consider the terms of such financing in light of the relative circumstances of both the debtor(s) and the potential lender(s).  *See e.g.*, *Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.),* 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (noting that, in appropriate situations, it may be necessary and prudent for a debtor to enter into a "hard bargain" to acquire needed funds in chapter 11).

35.     The DIP Financing was negotiated in good faith and at arm's length between the Debtors and the DIP Lenders, resulting in an agreement designed to permit the Debtors to continue to operate, satisfy all of their post-petition obligations, and maximize the value of their assets through the Plan contemplated by the RSA.  Significantly, there are no fees associated with the financing and aside from general unsecured creditors with whom the Debtors intend to negotiate with in good faith, the vast majority of the Debtors' economic stakeholders (e.g., Senior Lenders, Prepetition Subordinated Lenders, and the Securities Holders (as defined in the RSA)) have agreed to the treatment of their claims under the Plan, subject to court approval.  *See e.g., In re Snowshoe Co.,* 789 F.2d at 1088 (stating that section 364 of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence to preserve a vulnerable seasonal enterprise"); *In re Western Pacific*

*Airlines, Inc.*, 223 B.R. 567, 573 (Bankr. D. Colo. 1997) (authorizing postpetition financing to preserve value of aircraft leaseholds where to hold otherwise would result in the elimination of value and the "immediate collapse of the Debtor as a going concern").

36.    Accordingly, and as set forth in more detail herein, the Debtors submit that the terms and conditions of the proposed DIP Financing are fair, reasonable and appropriate under the circumstances.

> **D.    Entry Into the DIP Credit Agreement Constitutes a Sound Exercise of the Debtors' Business Judgment**

37.    Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  *See e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.),* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re Barbara K. Enters., Inc.,* Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *Ames Dep't Stores*, 115 B.R. at 40 ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.");

38.    Bankruptcy courts consistently defer to a debtor's business judgment on many business decisions in bankruptcy, including a debtor's decision to borrow money.  *See, e.g., In re AMR Corp.*, 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013) ("[i]n determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment); *In re DB Capital Holdings, LLC*,

454 B.R. 804, 822-23 (Bankr. D. Colo. 2011) (a debtor must demonstrate, among other things, that proposed financing is an exercise of its sound and reasonable business judgment).  As one court noted, "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). *See also Jurista v. Amerinox Processing, Inc*., 2013 U.S. Dist. LEXIS 44057, at *96-97, Case No. 12-3825 (NLH/JS) (D.N.J. March 28, 2013) (the business judgment rule "has been fashioned as a means of protecting directorial decision-making from judicial interference and constant hindsight.").

39.     To determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs*., 340 B.R. 222, 239 (Bankr. D. Del. 2006).  *See also In re Curlew Valley Assocs*., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

40.     The Debtors believe that the proposed terms of the DIP Financing, as set forth in the DIP Credit Agreement, are the best available to the Debtors and are reasonable under the circumstances.  The Debtors further believe that entry into the DIP Financing represents a sound exercise of the Debtors' business judgment because the funds provided by the DIP Financing are essential to enable the Debtors to continue to operate, reorganize their businesses, satisfy all of their chapter 11-related obligations, and implement the restructuring transactions contemplated under the RSA.  Without the additional funding provided for under the DIP Facility, the Debtors will likely run out of cash during the course of these Chapter 11 Cases and may be forced to shut down all of their operations and liquidate. The Debtors respectfully submit that because the circumstances of these Chapter 11 Cases require the Debtors to obtain financing

under section 364(c) and 364(d) of the Bankruptcy Code in order to continue as a going conern,

their entry into the DIP Credit Agreement, and approval of the DIP Financing, reflects a sound

exercise of their business judgment and is clearly in the best interests of the Debtors' estates as a

whole when compared with the alternatives.

## II.     The Proposed Repayment of Prepetition Indebtedness Should Be Approved.

41.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or

lease property, other than in the ordinary course of business, with court approval.  It is well

settled in the Third Circuit that such transactions should be approved when they are supported by

a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding

that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under

section 363(b) should be approved if the debtor can demonstrate a sound business justification

for the proposed transaction).  The business judgment rule shields a debtor's management from

judicial second- guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y.

1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a

presumption of reasonableness attaches to a debtor's management decisions.").

42.     Repayment of prepetition debt (often referred to as a "roll-up") is a

common feature in debtor-in-possession financing arrangements.  Courts in New Jersey and

other courts within the Third Circuit have approved similar DIP features on the first day of the

case or in a final order.  *See e.g.*, *In re Kids Brands, Inc.*, No. 14-22582 (MBK) (Bank. D. N.J.

January 26, 2015 (authorizing repayment/rollup of approximately $44 million of prepetition

obligations upon approval of DIP Facility); *In re Big M, Inc.*, No. 10233 (DHS) (Bankr. D. N.J.,

January 24, 2013 (authorizing an approximate $3.2 million repayment/roll up of a prepetition

term loan upon approval of the DIP facility); *In re MACH Gen, LLC*, No. 14-10461 (MFW)

(Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up

of approximately $144 million prepetition debt pursuant to interim order); *In re Furniture*

*Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013) (authorizing

approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing approximately $140 million DIP that included roll-up of approximately $48.6 million prepetition debt pursuant to interim order); *In re Dayton Superior Corp*., No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing approximately $165 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order).[7]

43.     Moreover, repayment of prepetition debt has been approved in several recent cases in the Third Circuit and other jurisdictions.  *See In re American Apparel, Inc.*, No. 15-12055 (Bankr. D. Del. October 6, 2017) (approving on an interim basis the repayment in full of all outstanding amounts under the prepetition revolving credit agreement); *In re The Gymboree Corp.*, No. 17-32968 (Bankr. E.D. Va. June 12, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $70 million of prepetition term loan obligations); *In re rue21, inc.*, No. 17-22045 (Bankr. W.D. Pa. May 18, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $100 million of prepetition term loans); *In re BCBG Max Azria Holdings*, LLC, No. 17-10466 (Bankr. S.D.N.Y. March 28, 2017) (approving on a final basis the conversion and "roll-up" of $35 million of prepetition term loan obligations); *In re BCBG Max Azria Holdings*, LLC, No. 17-10466 (Bankr. S.D.N.Y. March 2, 2017) (approving the conversion and "roll-up" of all outstanding prepetition revolving obligations on a rolling basis following entry of the interim order); *In re Aéropostale, Inc*., No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations).

44.     In the months preceding the Petition Date, the Senior Lenders extended more than $4.5 million in new money on an emergency basis in order to permit the Debtors to

---

[7] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

pay critical operating expenses and continue as a going concern.  The DIP Credit Agreement and Interim Order provides that these Existing Protective Advances will "roll up" into the DIP Facility upon entry of the Final Order, subject to the Committee's, if one is appointed, challenge rights.  *See* DIP Credit Agreement at §2.2(a); Interim Order ¶2(c).

45.     The repayment of the Existing Protective Advances is a sound exercise of the Debtors' business judgment, a material component of the structure of the DIP Facility, and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing.  *See* First Day Declaration ¶86.  The Debtors were unable to obtain debtor-in-possession financing on similar terms that would not have required the repayment of the prepetition advances.  *See id*.  In fact, the Debtors did not receive any alternative funding proposals.  Without continued access to the funds provided under the DIP Facility, the Debtors would be unable to fund the administration of these Chapter 11 Cases, the Debtors' businesses would immediately cease, and they would likely be forced to liquidate impacting hundreds of employees, vendors and other interested parties.  *See, e.g.,* First Day Declaration at ¶¶ 85-86.

46.     Due to the Debtors' dire financial condition – the reason for the Existing Protective Advances in the first instance – the economic reality is that a peaceful, going concern transition into chapter 11 that is already supported by the vast majority of the Debtors' economic stakeholders as evidenced by the RSA, comes at a price, which in this case the Debtors believe is eminently reasonable.  The Senior Lenders are not willing to continue lending postpetition without some assurance regarding their prepetition claims.  Absent the Senior Lenders' and Subordinated Lenders' support, the first month of the Chapter 11 Cases would likely devolve into a costly priming fight which the Debtors cannot afford and likely would not survive.  In contrast, the roll up of the Existing Protective Advances merely affects the timing, not the amount or certainty, of the Senior Lenders' recovery.  The purpose of the Existing Protective Advances was to ensure that the Debtors could pay critical operating expenses and continue as a going concern while the Debtors and their stakeholders negotiated a consensual restructuring.  In this respect, the Existing Protective Advances are in the nature of the DIP Financing into which

-40-

they are being converted.  Further, the secured claims arising under the Senior Loan Documents and Subordinated Loan Documents are required by section 1129 of the Bankruptcy Code to be satisfied in full (which based on the valuation underlying the RSA will not come close to occurring) before recoveries to junior creditors may be provided, absent consent of such secured parties (which consent the Debtors do not have here).  Importantly, the proposed "roll-up" is supported by both tranches of the Debtors' funded debt and subject to review by a creditors' committee (if appointed), or another party-in-interest with requisite standing, if a committee is not appointed.

47.    Given these circumstances, repayment of the Existing Protective Advances (only 14.6% of the total amount owed to the Senior Lenders) upon entry of the Final Order is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

III.    **The Debtors Should be Authorized to Continue to Use Cash Collateral**

48.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  Thus, pursuant to section 363(c) of the Bankruptcy Code, a debtor may not use cash collateral without the consent of any entity with an interest in such cash collateral or Court approval.  As indicated earlier, both the Senior Lenders and Subordinated Lenders have consented to the use of Cash Collateral in exchange for the adequate protection packages provided by the Debtors.

49.    Section 363(e) of the Bankruptcy Code provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to: (a) lump sum or periodic cash payments to the extent that such use will result in a

decrease in value of such entity's interest in the property; (b) provisions for an additional or replacement lien to the extent that the use of the property will cause a decrease in the value of such entity's interest in the property; and (c) such other relief as will result in the realization by the entity of the indubitable equivalent of such entity's interest in the property.  11 U.S.C. § 361.

50.    By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

51.    While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by case basis.  *See In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Swedeland Dcv. Grp.*, Inc., 16 F.3d 552, 564 (3d Cir. 1994); *In re N.J. Affordable Homes Corp.*, No. 05-60442, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *see also In re Mosello*, 195 BR. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy § 361.01[1] at 361-66 (15th ed. 1993)) (explaining that what constitutes adequate protection is not defined, and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

52.    For example, courts have held that replacement liens are sufficient adequate protection. *See In re Mt. Olive Hospitality, LLC*, Civil No. 13-3395 (RBK), 2014 WL 1309953, at *3, n. 6 (D.N.J. March 31, 2014).  *See also In re Airport Inn Assocs., Ltd.*, 132 B.R. 951, 960 (Bankr. D. Col. 1990) ("The court could order a lien in postpetition accounts receivable as adequate protection if that relief was requested . . . ."); *In re Int'l Design & Display Grp., Inc.*, 154 B.R. 362, 364 (Bankr. S.D. Fla. 1993) (court authorized debtor to use cash collateral and, as adequate protection, granted secured creditor replacement lien on all post-petition accounts receivable, inventory and contracts to the extent the creditor's collateral was depleted).

53.     The Interim Order provides adequate protection for the Debtors' use of the Cash Collateral of the Senior Lenders and Subordinated Lenders in the form of replacement security interests and liens (the "Adequate Protection Liens") on the Senior Collateral and Junior Collateral, but solely to the extent of any diminution in the value of such Senior Collateral and Junior Collateral.  The Adequate Protection Liens given to the Subordinated Lenders shall be subordinated to the Adequate Protection Liens given to the Senior Lenders.

54.     Additionally, in accordance with sections 364(c)(1) and 507(b) of the Bankruptcy Code, the Interim Order provides that the Senior Lenders and the Subordinated Lenders are granted a claim with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 1113 and 1114 of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors, any successor or trustee to the extent permitted by law, or any other creditor in the Chapter 11 Cases (the "Adequate Protection Superpriority Claims").

Finally, as is customary, the Debtors have agreed to pay certain of the Senior Lenders fees, costs and expenses.  Interim Order ¶3(y).

55.     Significantly, both the Senior Lenders and Subordinated Lenders have consented to the adequate protection packages provided for under the DIP Facility.  In sum, the adequate protection offered by the Debtors to the prepetition secured lenders – including the Adequate Protection Liens, Adequate Protection Superpriority Claims, and payment of certain fees and expenses incurred by the Senior Lenders – is fair, reasonable and sufficient to protect against the diminution of their collateral position.  Accordingly, the Debtors respectfully submit that the use of Cash Collateral on the terms set forth in the proposed Interim Order provides the Senior Lenders and the Subordinated Lenders with adequate protection and is in the best interest of the Debtors, the Debtors' estates, their creditors and all parties in interest, and, therefore should be authorized by this Court.

## III.    The Section 506(c) Waiver Should be Approved

56.    The Debtors seek approval of their waiver of any right to surcharge the Collateral pursuant to section 506(c) of the Bankruptcy Code.  Congress' intent in enacting section 506(c) of the Bankruptcy Code was to assure that when a claimant "expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral, the ... debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party." *In re Visual Indus., Inc.,* 57 F.3d 321, 325 (3d Cir. 1995) (quoting 124 Cong. Rec. 32,398 (cum. ed. Sept. 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S. Code Cong. & Admin. News 6451).  However, waivers of a debtor's right to surcharge a secured creditor's collateral are commonly found in DIP financing arrangements between sophisticated parties.  As one court has noted, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." *In re Molten Metal Tech., Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000), vacated and remanded on other grounds, 2001 WL 36381917 (1st Cir. BAP March 11, 2001).  *See also In re Nutri/System of Florida Assocs.*, 178 B.R. 645, 650 (E.D. Pa. 1985) (noting that the debtor had waived section 506(c) rights in obtaining debtor-in-possession financing).

57.    The waiver of surcharge rights under section 506(c) is particularly appropriate where, as here, it is consented to in exchange for benefits to be received from both postpetition financing and a Carve Out.  The Debtors have agreed to waive the uncertainty of their surcharge rights in exchange for immediate and necessary liquidity from the DIP Lenders and the valuable and predictable rights granted to the Debtors' estate professionals under the Carve Out. *See In re Lunan Family Rests. Ltd., P'Ship*, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the

secured creditor was the party primarily benefited by the expenditure]").    Accordingly, the
Debtors submit that the section 506(c) waiver is appropriate under the circumstances and should
be approved.

## IV.    Modification of the Automatic Stay Is Warranted

58.    The DIP Credit Agreement provides certain circumstances under which
the automatic stay of section 362 of the Bankruptcy Code may be modified.    Specifically, the
DIP Credit Agreement provides that upon the occurrence of an Event of Default, but subject to
five (5) days prior written notice to the Debtors with respect to an Event of Default, with a copy
of such notice provided to counsel for the Debtors, counsel for any Official Committee of
Unsecured Creditors, and the U.S. Trustee, the automatic stay shall terminate automatically to
allow the DIP Lenders to enforce their rights against the DIP Collateral and to exercise any other
default-related rights and remedies under the DIP Credit Agreement or applicable law.    Interim
Order ¶14.

59.    The Debtors submit that such modifications of the automatic stay are
customary and market in DIP financings similar to the DIP Financing proposed herein.
Accordingly, the Debtors submit that the Court should modify the automatic stay to the extent
contemplated by the DIP Credit Agreement and the proposed Interim Order.

## V.    Interim Approval of the DIP Financing Should Be Granted

60.    Bankruptcy Rules 4001(b)(2) and (c)(2) provide that a final hearing on a
motion for authorization to use Cash Collateral or a motion to obtain credit may not be
commenced earlier than 14 days after service of such motion.    The Court, however, is authorized
to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the
use of cash collateral or the obtaining of credit where, as here, such relief is necessary to avoid
immediate and irreparable harm to a debtor's estate, pending a final hearing.

61.    Here, the failure to obtain interim approval of the use of Cash Collateral
and the DIP Financing on an expedited basis is likely to lead to immediate and irreparable harm

to the Debtors' estates.  The Debtors have an immediate need for cash due to the Senior Lenders refusal to provide any additional Existing Protective Advances, and a need to quickly instill confidence in the their employees, their trade vendors, and service providers, that the Debtors will have access to sufficient working capital and liquidity for their operations during these Chapter 11 Cases and in the near term, the important Christmas/holiday season.  That confidence will help to preserve and maintain the going-concern value of the Company.  Accordingly, the Debtors seek immediate entry of the Interim Order to prevent immediate and irreparable harm to the Debtors' estates pending the Final Hearing pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).

## VI.    **Request for a Final Hearing**

62.    Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing as soon as practicable, and fix in the Interim Order a date and time prior to the Final Hearing for parties to file objections to approval of the Motion on a final basis and entry of a Final Order.

## WAIVER OF MEMORANDUM OF LAW

63.    Because the legal basis upon which the Debtors rely is incorporated herein and the Motion does not raise any novel issues of law, the Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J.  LBR 9013-1(a)(3).

## NO PRIOR REQUEST

64.    No previous motion for the relief sought herein has been made to this or to any other court.

## NOTICE

72.    Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102; (ii) Neligan LLP, Republic Center, 325 N. St. Paul, Suite 3600, Dallas, Texas 75201, Attention:

Patrick J. Neligan, Jr. and John D. Gaither, attorneys for Elm Park Capital Management, LLC and certain affiliates; (iii) Dorsey & Whitney LLP, 300 Crescent Court, Suite 400, Dallas, TX 75201, Attention: Larry Makel and Eric Lopez Schnabel, counsel for Seacoast Capital Partners III, L.P. and certain affiliates; (iv) Moore & VanAllen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, NC 28202-4003, Attention: Alan Pope, counsel for Benefit Street Partners and certain affiliates; (v) the Internal Revenue Service, 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016; (vi) the New Jersey Division of Taxation Compliance and Enforcement - Bankruptcy Unit, 50 Barrack Street, 9th Floor, Trenton, NJ 08695; (v) the Office of the Attorney General of the State of New Jersey, Division of Law, Richard J. Hughes Justice Complex, 25 Market Street, Trenton, NJ 08625; (vii) the Office of the United States Attorney, Peter Rodino Federal Building, 970 Broad Street, Suite 700, Newark, NJ 07102; and (viii) the Debtors' twenty largest unsecured creditors on a consolidated basis.  In light of the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

[*Remainder of page intentionally left blank*]

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form submitted herewith, (a) authorizing the Debtors to continue to use Cash Collateral on the terms proposed and obtain the DIP Financing from the DIP Lenders pursuant to the DIP Credit Agreement, (b) setting the Final Hearing on the Motion, and (c) granting the Debtors such other and further relief as the Court deems just and proper.

Dated:  December 19, 2018                    Respectfully submitted,

                                             **LOWENSTEIN SANDLER LLP**

                                             /s/ *Kenneth A. Rosen*
                                             Kenneth A. Rosen, Esq.
                                             Joseph J. DiPasquale, Esq.
                                             Eric S. Chafetz, Esq.
                                             Michael Papandrea, Esq.
                                             One Lowenstein Drive
                                             Roseland, New Jersey 07068
                                             (973) 597-2500 (Telephone)
                                             (973) 597-2400 (Facsimile)
                                             krosen@lowenstein.com
                                             jdipasquale@lowenstein.com
                                             echafetz@lowenstein.com
                                             mpapandrea@lowenstein.com

                                             *Proposed Counsel to the Debtors and*
                                             *Debtors-in-Possession*