## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

In re:

FRANK THEATRES BAYONNE/SOUTH
COVE, LLC., *et al.*,[1]

Debtors.

Chapter 11

Case No. 18-34808 (SLM)

(Joint Administration Requested)

## DECLARATION OF CHRISTOPHER LANG
## IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS
## AND FIRST DAY PLEADINGS

I, Christopher Lang, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Chief Restructuring Officer (the "CRO") and Authorized Signatory of

Frank Theatres Bayonne/South Cove, LLC ("Bayonne") and affiliated Debtors, one of the above-

captioned debtors and debtors-in-possession (Bayonne, and together with the other above-

captioned debtors and debtors-in-possession, collectively, the "Debtors" or "Company").  I have

served as the Debtors' consultant and Authorized Signatory since September 2017.

2.      I am currently a Director and Restructuring Services Leader with Moss Adams

LLP ("Moss"), a national accounting firm with more than 2,900 professionals and staff.  Prior to

joining Moss, I have held CEO, interim CFO, and additional roles in which I focused on

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  Frank Theatres Bayonne/South Cove, LLC (3162); Frank Entertainment Group, LLC (3966); Frank Management LLC (0186); Frank Theatres, LLC (5542); Frank All Star Theatres, LLC (0420); Frank Theatres Blacksburg LLC (2964); Frank Theatres Delray, LLC (7655); Frank Theatres Kingsport LLC (5083); Frank Theatres Montgomeryville, LLC (0692); Frank Theatres Parkside Town Commons LLC (9724); Frank Theatres Rio, LLC (1591); Frank Theatres Towne, LLC (1528); Frank Theatres York, LLC (7779); Frank Theatres Mt. Airy, LLC (7429); Frank Theatres Southern Pines, LLC (2508); Frank Theatres Sanford, LLC (7475); Frank Theatres Shallotte, LLC (7548); Revolutions at City Place LLC (6048); Revolutions of Saucon Valley LLC (1135); Frank Entertainment Rock Hill LLC (0753); Frank Entertainment PSL, LLC (7033); Frank Hospitality Saucon Valley LLC (8570); Frank Hospitality York LLC (6617); and Galleria Cinema, LLC (2529).

operational and turnaround strategy.  My experience includes financial and operational initiatives worth a combined $2.5 billion.

3.      I submit this declaration (the "Declaration") in support of the voluntary petitions for relief for the Debtors' cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and the motions and applications (collectively, the "First Day Pleadings") for related relief filed concurrently herewith as of the date hereof (the "Petition Date").  If called upon, I would and could testify competently to the facts set forth herein.

4.      In my capacity as CRO of the Debtors, I oversee and am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

5.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations and/or the Debtors' businesses generally, information learned from my review of relevant documents, and/or information provided to me by the Debtors' advisors or other members of management or employees of the Debtors.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

6.      I have reviewed the First Day Pleadings or have otherwise had their contents explained to me and am generally familiar with the relief sought in each pleading.  To the best of my knowledge and insofar as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief requested in each of the First Day Pleadings is necessary to minimize disruption to the Debtors' business operations, permit an effective transition into chapter 11, and preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders.

7.      I further believe that absent (i) immediate access to cash collateral and post-petition financing, and (ii) authority to make certain essential payments and otherwise continue conducting ordinary course business operations as described herein and in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their estates, creditors, and other stakeholders.

8.      To familiarize the Court with the Debtors' business and the first day relief sought by the Debtors in the First Day Pleadings, this Declaration is organized into four sections.  **Part I** provides background information with respect to the Debtors' business operations, corporate history, and organizational structure.  **Part II** provides a summary of the Debtors' pre-petition capital structure.  **Part III** describes the circumstances leading to the commencement of these Chapter 11 Cases.  **Part IV** summarizes the relief requested in and the facts supporting each of the First Day Pleadings.

I.      **BACKGROUND**

   A.      **Overview of Debtors' Businesses and Organizational Structure**

9.      The Debtors operate pure play movie theaters, combination movie theater/family entertainment complexes, and pure play family entertainment complexes in six (6) east coast states—New Jersey (including theaters located in Bayonne and Rio Grande), Florida, North Carolina, South Carolina, Pennsylvania, and Virginia—under the brand names Frank Theatres, CineBowl & Grille, and Revolutions.  The Company operates 15 movie theater and/or family entertainment venues broken down as follows:  (a) nine (9) pure play movie theaters in the six aforementioned states under the Frank Theatres name, (b) three (3) combination movie theater/family entertainment complexes in Florida, North Carolina, and Virginia under the CineBowl & Grille marquee, and (c) three (3) family entertainment complexes in three (3) states (Florida, South Carolina, and Pennsylvania) under the Revolutions brand name.

10.     The Company's Frank Theatres cinemas include 141 total screens, while each theater generally has 8-12 screens, offers stadium seating, 4k digital and 3D capable projection, Dolby® Digital surround sound, advance ticketing features and standard theater concessions. Certain locations also offer IMAX® or THX® technology and enhanced concessions, which include beer/wine and premium restaurant-style food.  Frank Theatres, including its predecessor, is one of the oldest continuously operating movie theater chains in the United States.

11.     The Company's CineBowl & Grille concept, the first of its kind in the United States, combines a traditional stadium seating movie theater with bowling, a redemption arcade, and a captive casual dining restaurant/bar under one roof.  Likewise, the Company's Revolutions concept combines bowling, a redemption arcade, billiards, a stadium-style live TV venue, live entertainment, and a captive casual dining restaurant/bar all under one roof.

12.     The Debtors employ approximately 694 employees ("Employees") throughout New Jersey, Florida, North Carolina, South Carolina, Pennsylvania, and Virginia and none of whom are subject to a collective bargaining agreement.  Of these Employees, approximately 43 are salaried and 651 are hourly.

13.     For the fiscal year that ended December 31, 2016, the Debtors recorded consolidated revenues of approximately $65,772,560, resulting in a net loss of approximately $10,281,045.   In fiscal year 2017, the Debtors' consolidated revenues decreased to approximately $56,709,358, and their loss increased to approximately $11,321,078.  Further, in fiscal year 2018 to date, the Debtors generated approximately $40,000,000 in revenues, and experienced a net loss of approximately $9,716,930.   The admissions revenue comprised approximately 46% of 2018 revenues.

14.     Frank Entertainment Group, LLC ("FEG" or the "Borrower") is the ultimate parent of all of the other Debtors, including Frank Management, LLC the main operating/management company.  A chart illustrating the organizational structure of the Debtors is attached hereto as **Exhibit A**.

## II.     DEBTORS' PREPETITION CAPITAL STRUCTURE

### A.     Senior Loan Documents

15.     FEG, as Borrower, and the other Debtors, as (the "Subsidiary Guarantors") guarantors, are parties to a Credit Agreement dated June 20, 2014 (as amended, modified or otherwise supplemented (the "Senior Credit Agreement"), and associated Loan Documents (as defined in the Senior Credit Agreement) (collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Senior Loan Documents") pursuant to which Elm Park Capital Management, LLC as Administrative Agent (in such capacity, the "Senior Agent") and the lenders that are parties thereto (in such capacity, the "Senior Lenders") extended a secured financing facility to FEG in the principal sum of approximately $21,000,000 (the "Prepetition Loan Facility").  As of the Petition Date, approximately $31,000,000 in principal remains outstanding under the Prepetition Loan Facility, inclusive of $4,527,008 of Existing Protective Advances (the "Existing Protective Advances") authorized pursuant to the Senior Loan Documents (together with any amounts incurred or accrued, but unpaid prior to the Petition Date (the "Senior Indebtedness").  To secure the Senior Indebtedness, the Debtors granted the Senior Lenders first-priority security interests in, and liens on (the "Senior Liens"), all of their personal and real property (collectively, the "Senior Collateral"), subject only to certain permitted encumbrances.

**B.     Subordinated Loan Documents**

16.     FEG, as Borrower, and the Subsidiary Guarantors are parties to a Second Lien Credit Agreement dated May 17, 2017 (collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time the "Subordinated Loan Documents"), pursuant to which Seacoast Capital Partners III, L.P. as Administrative Agent (the "Subordinated Agent") and the second lien lenders that are parties thereto (the "Subordinated Lenders") extended a secured financing facility to FEG in the principal sum of $3,042,673 (the "Subordinated Loan Facility").   As of the Petition Date, approximately $8,042,673 remains outstanding under the Subordinated Loan Facility, authorized pursuant to the Subordinated Loan Documents (together with any amounts incurred or accrued, but unpaid prior to the Petition Date the "Subordinated Indebtedness").   To secure the Subordinated Indebtedness, the Debtors granted to the Subordinated Lenders second-priority security interests in, and liens on (the "Subordinated Liens") all of their personal and real property (the "Junior Collateral"), subject only to certain permitted encumbrances. The Senior Lenders and the Subordinated Lenders are parties to that certain Subordination and Intercreditor Agreement dated May 17, 2017.

**C.     Other Liabilities**

**b.     Other General Unsecured Debt Obligations.**

17.     As of the Petition Date, the Debtors have aggregate unpaid unsecured trade, lease, and other ordinary course contractual obligations totaling approximately $5,357,992.   Of that amount, approximately $4,649,443 constitutes trade vendor payables.

**III.    EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES**

18.     The loans advanced under the Senior Credit Agreement were used by the Debtors to refinance existing indebtedness and provide growth capital.   Upon execution of the Senior

Loan Documents, the Company embarked on an expansion program to open several new locations, primarily in the Revolutions (bowling only format) and one additional CineBowl & Grille (combination bowling and theater) location.

19.     Poor location choice, combined with unprofitable leases, material cost overruns, delayed opening dates, and ineffective location-based management plagued the new Revolutions and CineBowl & Grille locations from the start and required an ever-growing need for cash from the balance of the seasoned portfolio of existing theaters.

20.     While operating cash and third-party loans were being used to support the liquidity need caused by the over-budget, past-deadline, and unprofitable new locations, the remainder of the existing locations also steadily declined in general admissions and total revenues as preventative maintenance, standard course refreshes, and local marketing initiatives were reduced or abandoned altogether.  In addition, landlords and critical vendors were not paid or were materially aged beyond their standard payment terms.  These poor management decisions were made in most cases without the knowledge or consent of the Debtors' capital providers.

21.     In some instances, the Company was evicted, locked out of its theater locations, and/or box office studios refused to allow the theaters to exhibit key first run movies which further exacerbated the decline in financial performance.

22.     Under Debtors' prior management (pre-September 2017), the physical state of many locations was severely neglected.  Much needed capital improvements were not made into maintenance or upgrades of many locations.  As a result, over time, the locations became dirty and in disrepair, which ultimately deterred business and resulted in a decrease in revenue. Despite the aforementioned project and operational challenges, former management at the

Company executed material contracts, including employment agreements, new location leases, and vendor supply agreements, subjecting the Company to costly and recurring liabilities which were not approved by the Board.  The Company is currently in litigation with members of former management.

23.    While the condition of the Company's locations deteriorated, the movie theater industry in general trended toward an enhanced movie going experience, including luxury recliners and a more "premium" experience.   At the same time, the Debtors' ticket and concession prices continued to rise in line with, or over, the industry average (which further discouraged customers).

24.    Other negative contributing factors included:   (i) generally poor delivery of customer experience under prior management; (ii) expansion into dining and bowling, areas outside prior management's core experience which complicated operations and distracted focus; (iii) the closure of three (3) locations – Kingsport, Superplay, and Towne; and (iv) general weakness in the theater industry during 2017, which magnified the impact of all of the above.

25.    Over the course of 2017, as fresh capital continued to be required to support the Debtors' business, the Senior Lenders and Subordinated Lenders, along with the preferred equity holders, negotiated a comprehensive restructuring of the existing capital structure.  As part of this restructuring, the existing management team was terminated and Moss, as financial advisor (and now also CRO) and Paragon Entertainment LLC ("Paragon"), as industry advisor, made recommendations to effectuate a wholesale retrofit of specific locations along with prospectively managing the Company on a go forward basis.

26.    Accordingly, the Debtors, working together with Moss and Paragon began a process in September 2017 with the goal of evaluating the Debtors' options and implementing a

strategic turnaround.    The Debtors and their advisors concluded that the Company's restructuring could best be accomplished in a jointly administered Chapter 11 proceeding for each of the Debtors (collectively, the "Chapter 11 Cases") via a court-approved Chapter 11 plan of reorganization consistent with the terms of the Restructuring Support Agreement ("RSA") and the Plan Term Sheet.  The RSA and Plan Term Sheet are expressly incorporated herein.  To fund the Chapter 11 Cases, the Senior Lenders will provide debtor-in-possession financing ("DIP Financing") as set forth in the Debtor-in-Possession Term Sheet (the "DIP Term Sheet").  The DIP Financing shall be subject to Definitive Documentation acceptable to the Senior Lenders in their sole discretion.  The DIP Term Sheet is expressly incorporated herein.  The Company sought proposals for alternative financing and not one party that was contacted made an offer to provide alternative financing, likely due to the lack of equity in the Debtors' assets and operations, disappointing financial results, the fact that the Senior Lenders would not voluntarily agree to the priming of the prepetition claims, and how the proposed DIP Financing does not include any fees.

27.    Consistent with the turnaround strategy identified by the Debtors and their advisors, the objective of the prearranged Chapter 11 is to maximize enterprise value by emerging from bankruptcy protection with (i) only the most potentially profitable locations, (ii) a new long-term management arrangement with Paragon, and (iii) renegotiated contracts/leases and the opportunity to succeed and ultimately grow within the industry.  The incremental working capital needed will allow for the maximization of the process to obtain the end result, while servicing the needs of all stakeholders of the total operational platform.    Within bankruptcy, the DIP Financing is expected to be used for working capital to ensure smooth operations throughout the process as well as to pay necessary administrative expenses.  We are

confident with DIP Financing, that the proposed restructuring can be accomplished within the time frames contemplated by RSA, Plan Term Sheet and DIP Term Sheet and successful.

28.    The Debtors ultimately decided to seek the protections of chapter 11 of the Bankruptcy Code in order to provide them with the breathing spell and relief necessary to pursue (i) a restructuring of a subset of the Debtors' assets and/or (ii) a sale of a subset of the Debtors' assets.  The Debtors therefore intend to file a proposed plan of reorganization promptly and, if necessary, seek approval of auction and sale procedures to consummate one or more sale transactions, as well as additional relief to maintain the Debtors' operations until such time as any restructuring sale(s) can be consummated.  To this end, the Debtors seek relief to gain and maintain the support of the Debtors' employees and other key constituencies, as well as to maintain the day-to-day operations of the Debtors' businesses with minimal disruption.  The Debtors' believe that such relief will be crucial to any reorganization or sale process and the ultimate success of the Debtors' efforts in these Chapter 11 Cases.

## IV.    FIRST DAY RELIEF REQUESTED[2]

29.    In order to preserve the value of the Debtors' businesses during the pendency of these Chapter 11 Cases by shedding unprofitable locations and leases, assuming the RSA, and moving towards confirmation of a plan of reorganization or consummating one or more sale transactions, it is critical for the Debtors to maintain the loyalty and goodwill of, among other constituencies, their employees, vendors, movie studios, and customers.

30.    To that end, the Debtors have filed the following First Day Pleadings seeking relief intended to allow the Debtors to effectively transition into chapter 11 and minimize

---

[2] Any capitalized term used but not defined herein shall have the meaning ascribed to such term in the respective First Day Pleadings.

disruption to the Debtors' business operations thereby preserving and maximizing the value of the Debtors' estate:

A.       **Administrative/Case Management Motions**

        i.       **Debtors' Application for Expedited Consideration of First Day Matters (the "Expedited First Day Application")**

31.       The Debtors request entry of an order designating their First Day Pleadings as requiring expedited consideration before this Court.  I believe that the relief requested in the Expedited First Day Application is essential to avoid the potentially disruptive impact the commencement of the Chapter 11 Cases might have on the Debtors and will facilitate the Debtors' orderly transition into Chapter 11 and maintain/increase going concern value. Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited First Day Application should be approved.

        ii.       **Debtors' Motion for an Order Pursuant to Bankruptcy Rule 1015 Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")**

32.       The Debtors request entry of an order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015(b) directing joint administration of the Chapter 11 Cases for procedural purposes only.  Specifically, the Debtors request that this Court maintain one file and one docket for each of the Chapter 11 Cases under the lead case, Frank Theatres Bayonne/South Cove, LLC.  Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases to indicate the joint administration of the Chapter 11 Cases.

33.       The Debtors also seek authority to file the monthly operating reports required by the U.S. Trustee's Operating Guidelines on a consolidated basis, but intend to track and break out disbursements on a Debtor-by-Debtor basis.

34.    Given the integrated nature of the Debtors' businesses, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.

35.    I believe the that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted

iii.    **Application for Designation as Complex Chapter 11 Cases (the "Complex Chapter 11 Application")**

36.    By the Complex Chapter 11 Application, the Debtors request entry of an order designating the Debtors' Chapter 11 Cases as a complex chapter 11 case pursuant to Exhibit F to the Court's *General Order Governing Procedures for Complex Chapter 11 Cases.*

37.    I believe that the relief requested in the Complex Chapter 11 Application is in the best interest of the Debtors' estates, their creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in a streamlined fashion and allow the U.S. Trustee and other parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.  Accordingly, on behalf of the Debtors, I respectfully submit that the Complex Chapter 11 Application should be approved.

        **iv.**      **Debtors' Motion for Entry of an Order Extending the Time to File Their Schedules and Statements (the "<u>Schedules and Statements Motion</u>")**

38.     The Debtors request entry of an order granting a 30-day extension of the time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") for a total of 44 days after the Petition Date.  The Debtors have several hundred of potential creditors, and the breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records, and complex accounting systems.  Given the size, complexity, and geographic scope of the Debtors' operations, as well as the number of creditors, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements, and the many employee and advisor hours required to complete them, would be unnecessarily burdensome to the Debtors during the first 14 days following the Petition Date.  The Debtors are sensitive to the need to complete the Schedules and Statements as soon as possible, and they intend to complete the Schedules and Statements before the proposed 44-day deadline, if possible.

39.     I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in the chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be granted.

        **v.**      **Debtors' Motion for an Order (I) Granting the Debtors an Extension of Time to File Their List of Creditors; (II) Authorizing the Debtors and/or Their Agent to (A) Prepare a Consolidated List of Creditors in Lieu of a Mailing List and (B) Mail Initial Notices; and (III) Granting Related Relief (the "<u>Creditor Matrix Motion</u>")**

40.     Pursuant to the Creditor Matrix Motion, the Debtors request entry of an order granting them an extension of time to file their list of creditors for 30 days after the Petition

Date.  The Debtors also propose to prepare a consolidated list of creditors and interest holders available to all parties-in-interest in lieu of submitting a mailing matrix.  Additionally, the Debtors seek authority to file a consolidated list of the Debtors' creditors holding the 30 largest unsecured claims.  Finally, the Debtors request that Prime Clerk, their proposed notice and claims agent, undertake all mailings directed by this Court, the U.S. Trustee, or as required by the Bankruptcy Code, including the notice of commencement of the Chapter 11 Cases.

41.    As previously stated, the Debtors have several hundred potential creditors, the breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records, and complex accounting systems.  Given the size and scope of the Debtors' operations and the number of creditors, I submit that the large amount of information that must be assembled to prepare the list of creditors, and the many employee and advisor hours required to complete it, would be unnecessarily burdensome to the Debtors at the beginning of the Chapter 11 Cases, which is a critical time for the Debtors.  The Debtors are sensitive to the need to complete the list of creditors as soon as possible, and they intend to complete the list of creditors before the proposed 30-day deadline, if possible.

42.    I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, creditors, and all parties-in interest, and will enable the Debtors to continue to operate their businesses in the chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be granted.

> **vi.    Debtors' Application for Entry of an Order Authorizing the Retention and Appointment of Prime Clerk LLC as Claims and Noticing Agent Effective as of the Petition Date (the "<u>Prime Clerk Application</u>")**

43.    Pursuant to the Prime Clerk Application, the Debtors seek to retain Prime Clerk as claims and noticing agent in the Chapter 11 Cases.  I believe that by retaining Prime Clerk, the

Debtors' estates, and particularly their creditors, will benefit from Prime Clerk's services.  Prime

Clerk specializes in noticing, claims processing, and other administrative tasks necessary to

operate chapter 11 cases effectively.  It is my understanding that Prime Clerk is fully equipped to

manage claims issues and provide notice to creditors and other interested parties in the Chapter

11 Cases.  Therefore, on behalf of the Debtors, I respectfully submit that the Prime Clerk

Application should be approved.

**B.      Operational/DIP Financing/Cash Collateral Motions**

**i.      Debtors' Motion for Interim and Final Orders (I) Authorizing but
not Directing the Debtors to (A) Pay Prepetition Wages, Salaries
and Related Obligations, (B) Pay and Remit Prepetition Payroll
Taxes and Other Deductions to Third Parties, and (C) Honor
Employee Benefit Programs in the Ordinary Course of Business,
(II) Authorizing and Directing Banks to Honor Checks and
Transfers for Payment of Prepetition Employee Obligations; and
(III) Granting Related Relief (the "<u>Wages Motion</u>")**

44.      By the Wages Motion, the Debtors seek entry of an order authorizing, but not

directing, the Debtors to (a) pay all pre-petition claims of employees for (i) wages and salaries;

(ii) vacation and paid absences; (iii) business expense allowances and reimbursements; (iv)

bonuses; (v) supplemental retirement; (vi) severance; (vii) payroll taxes and processing fees; and

(viii) other benefits.

45.      The Debtors employ approximately 694 employees that conduct the Debtors'

business, that conduct the Debtors' business, including executive, management, sales, finance

and accounting, information technology, theater, restaurant and bowling personnel.    In the

ordinary course of business, Employees are paid one week in arrears, bi-weekly, on Thursdays.

If either of these days falls on a weekend or holiday, employees are paid the day before the

weekend or holiday. As described below, all required tax deductions and voluntary deductions

are withheld automatically from paychecks. Funds to cover the Debtors' payroll are transferred

from Debtors' operating account to Debtors' payroll account. Each payroll period the Debtors pre-fund their Payroll Servicer on Wednesday for employee net wages, on Thursday for benefits and taxes, and on Friday for 401k contributions for the applicable Thursday payroll payment with the amounts necessary to satisfy the Employee-related payroll obligations.

46.     The Debtors seek authority to pay accrued pre-petition Employee Compensation and Expense Obligations and prepetition obligations arising under the Employee Benefits Programs (collectively, the "Employee Obligations") in the ordinary course of business. The Debtors' average bi-weekly Employee-related payroll obligations equal approximately $385,000. The Debtors' next payroll date, which covers amounts related to the pre-petition period, comes due on December 27, 2018. One debtor, Frank Theatres Southern Pines, LLC, has its next payroll date on December 20, 2018. The Wages Motion seeks authority, but not direction, to pay pre-petition Employee Compensation and Expense Obligations (as defined in the Wages Motion) in the aggregate amount of approximately $415,000 and pay all prepetition amounts owing under the Employee Benefits Programs (as defined in the Wages Motion). The Debtors do not believe that any Employee will receive a payment in excess of the $12,850 limit on priority claims for accrued but unpaid wages and contributions to employee benefit plans.

47.     The continued, uninterrupted service of the Employees is essential to the Debtors' restructuring efforts. I believe that the success of the Debtors' restructuring efforts is dependent upon the continued dedication, goodwill, and support of their Employees. I further believe that any delay in paying the Employee Obligations outstanding as of the Petition Date, a failure by the Debtors to continue their practices, programs, and policies with respect to Employee benefits could severely disrupt the Debtors' relationship with their workforce, impair morale at this critical juncture, and disrupt the Debtors' business operations. Absent payment of all accrued

Employee Obligations and continuation of the Debtors' benefits programs, I believe that Employees may quickly seek alternative employment, which would hinder the Debtors' ability to serve their customers while simultaneously requiring the Debtors to incur the cost and distraction of seeking replacement Employees instead of focusing on their reorganization efforts. I believe that the relief requested in the Wages Motion is in the best interests of the Debtors, their estates, and creditors, and all other parties-in-interest in the Chapter 11 Cases, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases uninterrupted. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be granted.

ii.    **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue Their Cash Management System, (II) Honor Certain Related Prepetition Obligations, (III) Maintain Existing Business Forms, and (IV) Continue to Perform Intercompany Transactions, (B) Authorizing and Directing the Debtors' Banks to Honor All Related Payment Requests, (C) Granting Interim and Final Waivers of the Debtors' Compliance With Section 345(b) of the Bankruptcy Code, (D) Scheduling a Final Hearing, and (E) Granting Related Relief (the "<u>Cash Management Motion</u>")**

48.    The Debtors request entry of an order authorizing them to (a) continue their Cash Management System, (ii) honor certain related prepetition obligations, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform Intercompany Transactions in the ordinary course, (b) authorizing and directing the Debtors' Banks to honor all related payment requests, (c) granting interim and final waivers of the Debtors' compliance with the deposit and investment guidelines set forth in section 345(b) of the Bankruptcy Code, (d) scheduling a final hearing to consider entry of an order approving the relief requested in the Cash Management Motion on a final basis, and (e) granting related relief.

49.     In the ordinary course of business, the Debtors utilize and maintain an integrated and centralized cash management system to collect, manage, and disburse funds used in their operations.    The Cash Management System is essential to the efficient execution and achievement of the Debtors' business objectives, and to maximizing the value of their estates.

50.     As of the Petition Date, the Debtors maintained twenty-six (26) accounts (the "Bank Accounts") at several banks and financial institutions (the "Banks") in the United States.

### (a) The Cash Management System

51.     The Cash Management System works generally as follows:  Individual debtor locations utilize local depositories to collect cash and make deposits of receipts from individual location sales.    Twice weekly, those local depositories are swept into an operating account maintained with Bancorp, which is in turn swept into a Main Collections Account at Bank of America ending in -4110.    Credit card and other electronic deposits are also made to the same main collections account.  From the Main Collections Account, the Debtors fund a Main Payroll Account maintained at Bank of America ending in -4113 and a Main Disbursement Account ending in -4136.    From the Main Payroll Account, the Debtors fund Paylocity and 401k disbursements.    From the Main Disbursement Account, the Debtors fund accounts payable and make other necessary disbursements in the ordinary course of business.    The Main Collections Account, Main Payroll account and Main Disbursement Account are all maintained with Bank of America under the debtor, Frank Management LLC.

52.     For some of the individual locations, separate local checking accounts are necessary at depositories to fund liquor purchases separate from the Main Disbursement Account.    The Debtors made significant efforts during the pre-petition period to ensure accounts are maintained at approved depositories, however, given the locations of certain Debtors, access

to depositories is limited and establishing new accounts would require the inconvenience of traveling long distances for everyday deposits and related banking services.

### (b) Bank and Investment Fees

53.     The Debtors pay on average approximately $10,000 per month in bank and investment fees incurred in connection with maintaining the Bank Accounts (the "Bank Fees"). The Debtors pay the Bank Fees as they come due on a rolling basis over the course of each month, typically by direct debit. The Debtors estimate that there are approximately $6,500 in outstanding Bank Fees as of the Petition Date.

### (c) Business Forms

54.     In the ordinary course of their business and as part of the Cash Management System, the Debtors utilize numerous preprinted business forms, including, without limitation, letterhead, purchase orders, invoices, and preprinted checks (the "Business Forms"). The Debtors also maintain books and records to document, among other things, receipts and expenses. To minimize expenses to the Debtors' estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of the Chapter 11 Cases, the Debtors request that the Court authorize the continued use of their Business Forms and other correspondence and documents as such forms were in existence immediately before the Petition Date and thereafter, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

### (d) Intercompany Transactions

55.     In connection with the daily operations of the Cash Management System, as funds are disbursed throughout the system, and as business is transacted among the Debtors, at any

given time there may be intercompany claims owing by one Debtor to another. The Debtors track all funds transfers in their accounting system and can ascertain, trace and account for all intercompany transactions (the "Intercompany Transactions"). Under existing procedures for identifying and recording Intercompany Transactions, the Debtors will be able to track and segregate post-petition Intercompany Transactions. If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be unnecessarily disrupted, the detriment of the Debtors and their estates.

56.    I believe the Debtors' continued use of the Cash Management System will greatly facilitate their transition into the Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of post-petition debts, and providing important internal controls. I believe that parties-in-interest will not be harmed by the Debtors' maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date. Specifically, the Debtors and their advisors have implemented internal protocols that prohibit payments on account of pre-petition debts without the prior approval of appropriate managers. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

57.    Given the substantial economic scale and geographic reach of the Debtors' business operations, I believe that any disruption to the Cash Management System could impede a successful restructuring of the Debtors' businesses. Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and will

enable the Debtors to operate their businesses in chapter 11 without disruption. Therefore, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

> **iii.** **Debtors' Motion For Interim and Final Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, (C) Establishing Procedures For Resolving Requests For Additional or Different Adequate Assurance of Payment, and (D) Scheduling a Final Hearing (the "Utilities Motion")**

58.    As of the Petition Date, the Debtors operate approximately 15 movie theater and/or entertainment venues consisting of 141 total screens in six (6) states (the "Locations"). Prior to the Petition Date, in the ordinary course of the Debtors' business, the Debtors spent an average monthly cost of approximately $200,000 to provide various Utility Services for the Locations.

59.    By the Utilities Motion, the Debtors request entry of an order (a) determining that their Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving the Debtors' proposed offer of adequate assurances (including an adequate assurance deposit of approximately $62,161) and procedures whereby Utility Providers may request additional or different adequate assurance, (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of pre-petition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance, (d) establishing procedures for the Utility Providers to object to the Debtors' proposed adequate assurance procedures, and (e) determining that the Debtors are not required to provide any additional adequate assurance.

60.    I believe that uninterrupted Utility Services for the Locations are essential to the Debtors' ongoing operations. Additionally, any interruption of Utility Services, even for a brief period of time, likely would negatively affect the Debtors' restructuring efforts. I believe, and I

am, advised that the proposed Procedures and the proposed aggregate Utility Deposit of $62,161

are necessary in the Chapter 11 Cases because if such measures are not approved, the Debtors

could be forced to address numerous requests by the Utility Providers for adequate security in a

disorganized manner during the critical first weeks of the Chapter 11 Cases.  Moreover, absent

the relief sought in the Utilities Motions, a Utility Provider could severely disrupt the Debtors'

operations at a particular Location by unilaterally deciding, on or after the 30th day following the

Petition Date, that it is not adequately protected and threaten to discontinue service or make an

exorbitant demand for payment to continue service.  Discontinuation of utility service could

essentially shut down business at a Location; any significant disruption of operations could put

the Chapter 11 Cases in jeopardy.

61.     I believe that the relief requested in the Utilities Motion is in the best interests of

the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to

continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of

the Debtor, I respectfully submit that the Utilities Motion should be granted.

> **iv.    Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Programs, (B) Pay any Prepetition Premiums and Related Obligations, and (C) Renew or Enter Into New Insurance Arrangements; and (II) Granting Related Relief  (the "<u>Insurance Motion</u>")**

62.     By the Insurance Motion, the Debtors seek entry of an order to continue various

pre-petition insurance policies and premium financing agreements covering a variety of matters

such as special form property liability, equipment breakdown liability, general liability, umbrella

liability, automobile liability, crime liability, network security and broad form privacy liability,

and workers' compensation liability (the "<u>Insurance Programs</u>"), and pay all pre-petition and

post-petition obligations in respect thereof in the ordinary course of their businesses.

63.    In connection with the day-to-day operations of their business, the Debtors maintain various Insurance Programs and related insurance policies as set forth on a non-exhaustive list attached to the Insurance Motion through several different insurance providers (the "Insurance Providers").

64.    The Debtors are required to pay premiums under the Insurance Programs based on a fixed amount established and billed by each Insurance Provider.  Depending on the particular Insurance Policy, premiums are either (i) paid in installments over the term of the policy or (ii) pre-paid at a policy's inception or renewal.  As of the Petition Date, the Debtors are current on all of their Insurance Programs.  However, as set forth in the Insurance Motion, certain obligations under the Insurance Programs may have accrued prepetition that do not become due until after the Petition Date.

65.    The total annual premiums under the current Insurance Policies and PFAs are approximately $1.1 million, including all related fees and charges.  The Debtors pay the aggregate amount of approximately $75,000 per month under the PFAs.

66.    The Debtors' general liability and umbrella liability Insurance Policies with respect to the CineBowl and Revolutions businesses expire on January 31, 2019.  Therefore, the Debtors intend to renew these policies, and renew the PFA or a similar PFA with respect to such Insurance Policies, shortly after the Petition Date.  The Debtors have included the expected costs of renewing these Insurance Policies in their proposed budget.

67.    Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Insurance Motion be granted to prevent any disruption of the Debtors' Insurance Policies and Insurance Programs and any attendant harm to the Debtors' businesses that such disruption would cause.

> **v.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto (the "<u>Tax Motion</u>")**

68.    In the Tax Motion, the Debtors request entry of an order authorizing them to pay corporate taxes, income taxes (federal and state), state franchise taxes, sales and use taxes and property taxes on owned and leased property that accrued or arose in the ordinary course of business before the Petition Date.  The Debtors estimate that the following approximate amount of taxes and fees in each category, totaling approximately $1,271,669 in the aggregate, have accrued and remain owing as of the Petition Date:

| Category | Approximate Amount |
| --- | --- |
| Sales Taxes | $912,141.91 |
| Use Taxes | $8,035.52 |
| Property Taxes | $343,991.92 |
| Fees | $7,500 |

69.    The Debtors must continue to pay all taxes and governmental fees when due to continue operating in certain jurisdictions.  Failure to pay all taxes and governmental fees (including taxes and fees that arose pre-petition) when due could result in taxing authorities suspending the Debtors' ability to operate, filing liens, and/or seeking relief from the automatic stay to take action against the Debtors.  In many jurisdictions, certain taxes, such as sales taxes, are collected in trust for the applicable taxing authorities.  Moreover, many jurisdictions may seek to impose liability on the Debtors' directors and officers for unpaid taxes, distracting the Debtors' key management personnel from the Debtors' reorganization efforts at a time when their commitment to the Debtors is most critical.

70.    The relief the Debtors seek in the Tax Motion will enable the Debtors to continue to operate their business during the Chapter 11 Cases uninterrupted.  Accordingly, to prevent

immediate, irreparable harm to the Debtors' business, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors and their estates and creditors and all other parties-in-interest in the Chapter 11 Cases and, therefore, should be granted.

> **vi.    Debtors' Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors and (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto (the "Critical Vendor Motion")**

71.    The Debtors, with the assistance of their advisors, have spent significant time reviewing and analyzing their books and records and consulting industry advisors to identify certain critical business relationships and/or suppliers of goods and services (the "Critical Vendors"),[3] the loss of which could immediately and irreparably harm their businesses, shrink their market share, reduce their enterprise value, and/or significantly impair their going-concern viability.

72.    In an exercise of their business judgment, the Debtors have determined that continuing to receive goods and services from the Critical Vendors is necessary to operate and restructure their business as a going concern and to maximize value.  If granted discretion to satisfy Critical Vendor Claims as requested in this Motion, the Debtors will assess, on a case by case basis, the benefits to the estates of paying Critical Vendor Claims, and pay such claim only to the extent the estate will benefit. Without this relief, the Debtors believe that the Critical Vendors may cease providing goods and services to the Debtors or otherwise take action to impede the Debtors' restructuring—a result that could be devastating for the Debtors and their stakeholders.

---

[3] The Debtors will provide the list of Critical Vendors to the DIP Lenders and counsel to the Official Committee of Unsecured Creditors (if any) appointed in these Chapter 11 Cases upon agreement from such parties that such information will be treated as confidential.

73.     The Debtors' businesses depend on, among other things, their ability to retain their vendors and service providers and to maintain their reputation and customer loyalty within their respective movie theater industry.  By this Motion, the Debtors seek entry of an order granting them authority to make payments on account of the prepetition claims of the Critical Vendors (the "Critical Vendor Claims"), not to exceed an aggregate amount of $100,000 on an interim basis (the "Interim Critical Vendor Claims Cap"), and $300,000 on a final basis (the "Final Critical Vendor Claims Cap," and together with the Interim Critical Vendor Claims Cap, the "Critical Vendor Claims Caps").

74.     The Debtors have categorized their Critical Vendors into one group for purposes of the Critical Vendor Motion and seek interim and final caps on payments to such Critical Vendors on account of their prepetition claims.  The Debtors have Critical Vendors on account of operational vendor arrangements with the Debtors as well with film studios for the provision of movies to be shown at the various locations.

75.     The Debtors seek authority to pay, in their sole discretion and business judgment, all or a portion of the Critical Vendor Claims.  The Final Critical Vendor Claims Cap represents the Debtors' estimate of the maximum amount needed to pay the Critical Vendor Claims. Of this amount, the Debtors estimate the maximum amount needed to pay Critical Vendor Claims before the final hearing on the Critical Vendor Motion is $100,000.  The Final Critical Vendor Claims Cap represents the Debtors' best estimate as to how much must be paid to such creditors to continue an uninterrupted supply of critical goods and services; the Debtors may pay less than the requested amount. The Debtors further request that the Court grant the Debtors the authority to allocate the foregoing amounts at the Debtors' discretion without prejudice to seek additional

relief on an emergency basis, and subject to an agreement to receive terms consistent with Customary Trade Terms from the Critical Vendors.

76.    I believe that the viability to pay Critical Vendors and the continued availability of trade credit as requested in the Critical Vendor Motion will enable the Debtors to maximize the value of their businesses, and avoid the termination of business by the Critical Vendors and the resulting need for increased funding that would ultimately impede the Debtors' ability to operate.  The authority to pay the Critical Vendor Claims on the terms set forth in the Critical Vendor Motion is therefore in the best interests of the Debtors, their estates, customers, and creditors.  Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Critical Vendor Motion be granted.

> **vii.    Debtors' Motion for Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to Honor Certain Prepetition Obligations to Customers and to Continue, Renew, Replace, Modify, Implement, or Terminate Customer Programs in the Ordinary Course of Business, and (II) Authorizing and Directing Financial Institutions to Honor all Related Checks and Electronic Payment Requests (the "Customer Programs Motion")**

77.    In the ordinary course of their business, the Debtors engage in certain marketing and sales practices that are, among other things, targeted to develop and sustain positive reputations for each of the various locations in which the Debtors' businesses are located, and designed to attract new customers to the Debtors' businesses and enhance loyalty and sales among the Debtors' existing customer base.  These sales and practices include the sale and honoring of prepaid gift certificates (collectively, the "Gift Cards"), the sale of and honoring of prepaid goods and services at a discount to the purchasing customer (collectively, the "Prepaid Discounts"), the acceptance and honoring of customer deposits for events (the "Customer Deposits"), the maintenance of a point-based loyalty program (the "Loyalty Program"), and

certain other miscellaneous programs (collectively with the Gift Cards, Prepaid Discounts, Customer Deposits, and Loyalty Program, the "Customer Programs").

78.     By the Customer Programs Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to honor certain pre-petition obligations to customers, and continue, renew, replace, modify, implement new, and/or terminate their Customer Programs in the ordinary course of business without further application to the Court, and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests to the foregoing.

### (a)     Gift Cards

79.     The Debtors sell Gift Cards to customers, which are prepaid and redeemable for movie tickets, as well as concessions and food purchases, at the Debtors' various business locations.   As of the Petition Date, the aggregate amount of Gift Cards outstanding is approximately $210,000.  The outstanding Gift Cards constitute potential non-cash obligations of the Debtors.

### (b)     Prepaid Discounts

80.     The Debtors provide certain Prepaid Discounts in order to help incentivize and maximize sales.   These Prepaid Discounts consist primarily of the Debtors' "Super Saver" program that allows customers to purchase tickets in bulk and in advance at a discount from the Debtors' standard prices.   The aggregate amount of outstanding Prepaid Discounts as of the Petition Date is approximately $50,000.

### (c)     Customer Deposits

81.     The Debtors permit customers to reserve space in their various business locations for the purposes of hosting group events (such as birthday or holiday parties).   Therefore, in the

ordinary course of business, the Debtors' customers deposit money with the Debtors to reserve future goods and services in connection with such events.  As of the Petition Date, the aggregate amount of pending Customer Deposits is approximately $100,000.

### (d)      Loyalty Program

82.      Additionally, the Debtors maintain a Loyalty Program under which certain customers receive "points" in connection with their purchases of the Debtors' goods and services, and these points can be redeemed in exchange for discounted, or free, movie tickets and concession items.  The Debtors believe that the aggregate amount of liability or obligations in connection with the Loyalty Program is not material.

### (e)      Other Customer Programs

83.      In the ordinary course of business, in addition to the foregoing Customer Programs, the Debtors engage in various other programs including discounts and offers to their employees, and periodic discounts available to the public.  Although the Debtors do not believe they have any outstanding pre-petition obligations in connection with these Customer Programs, the Debtors, out of an abundance of caution, request authority to continue to honor any obligations related to these programs post-petition in the ordinary course of business, regardless of when they may be deemed to arise.

84.      I believe that the continuance of the Customer Programs in the ordinary course of business and the authority to satisfy pre-petition obligations relating thereto are essential to facilitate the Debtors' transition into chapter 11, maintain customer confidence and trust, and enable the Debtors to successfully undergo the chapter 11 reorganization process.  Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be granted.

> **viii.**    **Debtors' Motion for Interim and Final Orders (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Authoring the Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105(a), 362, and 364(c) and (d), (IV) Granting Liens and Superpriority Claims to the DIP Lenders Pursuant to 11 U.S.C. § 364(c), (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Financing Motion")**

85.    Subject to Court approval, the Debtors have negotiated and reached an agreement to enter into the DIP Facility that consists of a senior secured, superpriority, post-petition delayed draw term loan facility of up to $5,500,000 on a final basis.  The Debtors seek authority to draw up to $1,000,000 of the DIP Facility on an interim basis.  Upon entry of the Final Order, all Existing Protective Advances outstanding under the Senior Loan Document shall be deemed obligations under the DIP Facility.

86.    The Debtors intend to use the Chapter 11 Cases to deleverage their balance sheets, restructure their debt obligations, and propose a feasible plan or reorganization, the terms of which are incorporated into a RSA entered into between and among FEG, the Subsidiary Guarantors, the Senior Agent, the Senior Lenders, the Subordinated Lenders, and the Securities Holders.  The Debtors intend to file a motion to assume the RSA within two days after the Petition Date.  Pursuant to the RSA, the Plan must be filed within 28 days after the Petition Date. Pending the filing of a Plan, the Debtors intend to operate their businesses in the ordinary course by continuing to retain and pay their employees and provide high level service to their customers.

87.    The Debtors, however, do not have sufficient unencumbered cash or other assets to continue to operate their businesses during these Chapter 11 Cases or to effectuate the restructuring transactions provided for in the RSA.  The Debtors will be immediately and irreparably harmed if they are not granted the authority to use the Cash Collateral of the Senior

Lenders and Subordinated Lenders, and to obtain post-petition financing from the DIP Lenders in accordance with the terms of the DIP Credit Agreement. Significantly, the Senior Lenders, owed approximately $31,000,000 as of the Petition Date (inclusive of Existing Protective Advances totaling approximately $4,527,008), have refused to consent to the priming of their prepetition secured claims and the Debtors believe for a variety of reasons that a priming fight is not realistic due to the dire financial condition of the Debtors. Accordingly, the relief sought in the Financing Motion is necessary in order to permit, among other things, the orderly continuation of the Debtors' businesses, the ability to fund payroll and payroll taxes, the maintenance of their relations with vendors and suppliers, satisfaction of their working capital needs, as well as the ability to pay taxes, and to pay for inventory, supplies, overhead, insurance and other necessary ordinary course expenses. The Debtors' access to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of new indebtedness under the DIP Facility, and other financial accommodations, is vital to the preservation and maintenance of the going concern value of the Debtors and to a successful reorganization of the Debtors pursuant to the terms of the RSA.

88.     While the Senior Lenders have continued to fund the Debtors' substantial cash shortfalls while the parties negotiated a consensual restructuring, the Senior Lenders have refused to make any additional new money advances without the protections afforded under the Bankruptcy Code. Absent use of Cash Collateral and the additional funds provided by the DIP Financing, the Debtors project that they will run out of cash to operate within days. In fact, in the days and weeks leading to the Petition Date, the Senior Lenders agreed to extend $800,000 of Existing Protective Advances to preserve the value of the estate assets that are necessary for the reorganization (e.g., the payment of rent on certain cash flow positive properties, the funding of

payroll, and required payments to film studios).  The Senior Lenders provided these Existing

Protective Advances on the condition that the Existing Protective Advances would be repaid as

part of the DIP Facility.  Given the Debtors' immediate need for the Existing Protective

Advances in order to avoid a disruption in their operations and inability to obtain similar

financing from other sources that would not have required the repayment of such advances, the

Debtors determined that agreeing to such terms was reasonable and necessary to the continued

operation of their businesses.  The Debtors require the continued use of Cash Collateral to fund

their operations with any shortfall in funds provided for by the DIP Financing.  It is critical that

the Debtors have sufficient funding to meet their ordinary course and bankruptcy-related

administrative expense obligations in order to effectuate an orderly reorganization, especially in

the crucial holiday/Christmas season.  I believe that the DIP Financing, together with the

continued use of Cash Collateral, will enable the Debtors to meet all of their obligations in these

Chapter 11 Cases.

89.    Given the Debtors' existing capital structure and financial condition, they were

unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy

Code as an administrative expense.  The Debtors were also unable to obtain secured credit

allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without

granting the DIP Lenders, subject to the Carve Out, the DIP Liens and the DIP Superpriority

Claims under the terms and conditions set forth in the DIP Credit Agreement and Interim Order.

90.    After good faith arm's length negotiations with respect to the terms and

conditions of the DIP Financing, and after making a reasonable effort to solicit proposals from

other potential DIP lenders, the Debtors concluded, in an exercise of their sound business

judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of the DIP

Credit Agreement and the Interim Order clearly represents the most favorable – and due to their current financial issues likely only – terms and adequate source of financing presently available to the Debtors.

91.     The Debtors sought proposals for alternative financing from 12 sources of financing including hedge funds and private equity funds.  However, not one of the proposed funding sources that was contacted made a proposal to provide alternative financing.  This is likely due to the lack of equity in the Debtors' assets and operations, the fact that the Senior Lenders refused to consent to priming of their secured claims, and the fact that the DIP Financing being provided by the DIP Lenders does not come with any attendant fees.

92.     For the foregoing reasons, I believe that the terms and conditions of the DIP Financing and the use of Cash Collateral are fair, reasonable, and negotiated in good faith and at arms' length after extensive efforts to obtain the most advantageous post-petition financing.  The Debtors and their advisors have determined, in their reasonable business judgment, that the DIP Financing is the best financing option available under the present circumstances.  I further believe that the relief requested in the Financing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to operate their businesses in chapter 11 without disruption.  On behalf of the Debtors, I respectfully submit that the Court should (a) approve the immediate access to the DIP Financing and use of Cash Collateral on an interim basis pursuant to the proposed Interim DIP Order and (b) enter the Final DIP Order at the Final Hearing.

## V.     CONCLUSION

93.     The relief sought in the various First Day Pleadings would allow the Debtors to, among other things: (i) obtain certain operational relief and establish various administrative

procedures to promote a seamless transition into bankruptcy, and (ii) obtain debtor-in-possession financing and use cash collateral in order to fund the Debtors' business operations and the administration of these Chapter 11 Cases.

94.     I have reviewed each of the First Day Pleadings and I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief sought in the First Day Pleadings will be critical to maintaining the stability of the Debtors' business operations, preserving value, and allowing the Debtors to focus their efforts on the restructuring and the shedding of underperforming leases/locations.  Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant adverse, immediate, and irreparable consequences.

95.     Several of the First Day Pleadings request authority to pay certain pre-petition claims.  I am told by the Company's advisors that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first twenty-one days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors intentionally narrowly tailored their requests for immediate authority to pay certain pre-petition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Accordingly, certain requests for relief will be deferred for consideration at a later hearing.

96.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, to the best of my knowledge, information and belief, the statements set forth in this Declaration are true and correct.

**Frank Theatres Bayonne/South Cove, LLC, *et al.*,**
*Chapter 11 Debtors and Debtors in Possession*

Dated:  December 19, 2018        By:  */s/ Christopher Lang*                    
                Christopher Lang
                Chief Restructuring Officer

# EXHIBIT A

Frank Entertainment Group, LLC ("FEG")
Frank Management, LLC (FEG 100% owned, Operating/management company)
Operating Entities
Frank Theatres, LLC (Owned 100% by FEG)
Frank Entertainment Rock Hill, LLC (Owned 100% by FEG) (Revolutions Location in South Carolina)
Revolutions of Saucon Valley, LLC (Owned 100% by FEG) (Revolutions location in Bethlehem, PA)
Frank Hospitality Saucon Valley, LLC (Owned 100% by FEG) (Tied to Revolutions Saucon Valley, Liquor license)
Revolutions at City Place, LLC (Owned 100% by FEG) (Revolutions location in West Palm Beach, FL)
Frank All Star Theatres, LLC (Owned 100% by FEG) (Not a location now, this is tied to the First Run Property leases)
Frank Theatres Montgomeryville, LLC (Owned 100% by FEG) (Movie Theatre in Montgomeryville,PA)
Frank Theatres Rio, LLC (Owned 100% by FEG) (Movie Theatre in Rio Grande, NJ)
Frank Theatres Bayonne/South Cove, LLC (Owned 100% by FEG) (Movie Theatre in Bayonne, NJ)
Frank Theatres York, LLC (Owned 100% by FEG) (Movie Theatre in York, PA)
Frank Hospitality York, LLC (Owned 100% by FEG) (Tied to Movie Theatre for York, Liquor license)
Galleria Cinema, LLC (Owned 100% by FEG) (Movie Theatre in Venice, FL)
Frank Theatres Delray, LLC (Owned 100% by FEG) (Movie Theatre & Family entertainment center, Delray Beach, FL)
Frank Theatres Parkside Town Commons, LLC (Owned 100% by FEG) (Movie Theatre & Family entertainment center, Cary, NC)
Frank Theatres Blacksburg, LLC (Owned 100% by FEG) (Movie Theatre & Family entertainment center, Blacksburg, VA)
Frank Theatres Southern Pines, LLC (Owned 100% by FEG) (Movie Theatre in Sandhills, NC) (Part of the All Star Theatres and First Run Leases)
Frank Theatres Sanford, LLC (Owned 100% by FEG) (Movie Theatre in Mt. Airy, NC) (Part of the All Star Theatres and First Run Leases)
Frank Theatres Shallotte, LLC (Owned 100% by FEG) (Movie Theatre in Mt. Airy, NC) (Part of the All Star Theatres and First Run Leases)
Frank Theatres Mt. Airy, LLC (Owned 100% by FEG) (Movie Theatre in Mt. Airy, NC) (Part of the All Star Theatres and First Run Leases)
Inactive Entities
Frank Entertainment PSL, LLC
Frank Theatres Towne, LLC
Frank Theatres Kingsport, LLC

