**WOMBLE BOND DICKINSON (US) LLP**
Ericka F. Johnson, Esq. (NJ Bar No. 032162007)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Phone: (302) 252-4320
Fax: (302) 252-4330
E-mail: Ericka.Johnson@wbd-us.com

-and-

Richard A. Prosser, Esq.
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Phone: (919) 755-2100
E-mail: Richard.Prosser@wbd-us.com

*Attorneys for Cotton Commercial USA, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>FRANK THEATRES BAYONNE/SOUTH COVE, LLC, *et al.*,[1, 2]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-34808 (SLM)<br><br>(Jointly Administered)<br><br>**Related Docket No. 868** |

---

[1] Prior to the Effective Date (as defined herein) of the Modified Plan (as defined herein), the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") and the last four digits of each Debtor's taxpayer identification number were as follows: Frank Theatres Bayonne/South Cove, LLC (3162); Frank Entertainment Group, LLC (3966); Frank Management LLC (0186); Frank Theatres, LLC (5542); Frank All Star Theatres, LLC (0420); Frank Theatres Blacksburg LLC (2964); Frank Theatres Delray, LLC (7655); Frank Theatres Kingsport LLC (5083); Frank Theatres Montgomeryville, LLC (0692); Frank Theatres Parkside Town Commons LLC (9724); Frank Theatres Rio, LLC (1591); Frank Theatres Towne, LLC (1528); Frank Theatres York, LLC (7779); Frank Theatres Mt. Airy, LLC (7429); Frank Theatres Southern Pines, LLC (2508); Frank Theatres Sanford, LLC (7475); Frank Theatres Shallotte, LLC (7548); Revolutions at City Place LLC (6048); Revolutions of Saucon Valley LLC (1135); Frank Entertainment Rock Hill LLC (0753); Frank Entertainment PSL, LLC (7033); Frank Hospitality Saucon Valley LLC (8570); Frank Hospitality York LLC (6617); and Galleria Cinema, LLC (2529).

[2] Upon the Effective Date of the Modified Plan (as defined herein), the presently operating Reorganized Debtors are as follows: Frank Entertainment Group, LLC; Frank Management, LLC; Frank Theatres York, LLC; Frank Hospitality York, LLC; Frank Theatres Delray, LLC; Frank Theatres Parkside Town Commons, LLC; Frank Blacksburg, LLC; Frank Theatres Southern Pines, LLC; Frank Theatres, LLC; and Frank Management, LLC.

WBD (US) 48679449v3

**PRELIMINARY RESPONSE OF COTTON COMMERCIAL USA, INC.
TO THE ADMINISTRATIVE AND PRIORITY CLAIMS AGENT'S
FIRST OMNIBUS OBJECTION TO CERTAIN (I) SATISFIED CLAIMS,
(II) CLAIMS TO BE RECLASSIFIED, AND (III) CLAIMS TO BE
<u>REDUCED TO $0 AND THEN EXPUNGED</u>**

Cotton Commercial USA, Inc. ("<u>Cotton</u>"), by and through its undersigned counsel, submits its response (this "<u>Preliminary Response</u>") to the Administrative and Priority Claims Agent's First Omnibus Objection to Certain (I) Satisfied Claims, (II) Claims to be Reclassified, and (III) Claims to be Reduced to $0 and then Expunged (Docket No. 868) (the "<u>Claim Objection</u>") filed by Moss Adams LLP (the "<u>Administrative and Priority Claims Agent</u>").  In support of this Preliminary Response, Cotton relies on the Declaration of James Scaife in support of the Preliminary Response, attached hereto as <u>Exhibit A</u>, and respectfully states as follows:

## BACKGROUND

**A. Procedural Background**

1. On December 19, 2018, Frank All Star Theatres, LLC ("<u>Frank All Star</u>"), Frank Theatres Shallotte, LLC ("<u>Frank Theatres Shallotte</u>"), Galleria Cinema, LLC ("<u>Galleria Cinema</u>"), and Frank Entertainment Group, LLC ("<u>Frank Entertainment Group</u>," and collectively with Frank All Star, Frank Theatres Shallotte, and Galleria Cinema, the "<u>Frank Parties</u>") and other affiliated entities (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>").

2. On February 4, 2019, Cotton timely filed a proof of claim with the Debtors' claims agent in the amount of $1,070,043.85 (the "<u>Cotton Claim</u>").  The Cotton Claim was designated Claim No. 57.

3. On July 29, 2019, the Court entered an order confirming the First Amended Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan"). On October 31, 2019, the plan went effective. See Docket No. 792.

**B. History of the Cotton Claim**

    **i.    Hurricane Florence Damages the Theater Property**

4. Frank All Star is the former tenant/lessee of real property located at 5200 Bridgers Road, Shallotte, Brunswick County, North Carolina (the "Theater Property"). The Theater Property is improved with a ten-screen multiplex movie theater that Frank All Star previously operated under the assumed names "Frank Theatre Coastal Stadium" or "Coastal Stadium 10" or some combination thereof.

5. Historically, Frank All Star and/or one or more of its affiliates initially operated the Theatre Property pursuant to a lease (the "Theater Lease") with STORE Master Funding III, LLC ("STORE"). In September 2016, STORE sold and conveyed the Theater Property to Firstrun, L.L.C. ("Firstrun"), and the Theater Lease was amended to substitute Firstrun as owner/lessor. STORE retained a security interest in the Theater Property as part of the purchase/sale transaction with Firstrun.

6. Over a multi-day period, beginning on or about September 12, 2018, Hurricane Florence caused catastrophic flooding and wind damage along North Carolina's southern coast, including in the location of the Theater Property. The Theater Property suffered significant wind damage and water intrusion from the storm, including substantial interior and exterior damage to the movie theater and severe damage to the roof.

7. Upon information and belief, the Theater Lease required Frank All Star to maintain hazard insurance, including windstorm coverage, on the Theater Property. Upon further

3

information and belief, in the event of a casualty loss or damage to the Theater Property, Frank All Star was further required to complete necessary repairs to restore the Theater Property.

8. The Hurricane Florence storm damage to the Theater Property was covered by a Windstorm or Hail Policy obtained by Frank Entertainment Group, as named insured, and issued by Mt. Hawley Insurance Company, Policy No. MWH0060066 (the "Insurance Policy").

9. Upon information and belief, pursuant to the most recent endorsements, Frank All Star, Frank Theatres Shallotte, Galleria Cinema, and Frank Entertainment Group are the named insureds under the Insurance Policy.

10. Upon information and belief, STORE is named as an additional insured under the Insurance Policy as a condition of the Theater Lease and the financing STORE and/or its affiliates provided to Firstrun in connection with its acquisition of the Theater Property.

## ii. Cotton Contracts to Remediate/Restore the Property

11. After Hurricane Florence, Frank All Star entered into contracts with Cotton for remediation and restoration services to repair the damage to the Theater Property.

12. Cotton divided its services into multiple phases with separate contracts based on the corresponding scope of work. The first two phases included: (a) roof reconstruction/replacement pursuant to a Construction Services Agreement dated September 30, 2018 in the amount of $496,908.28 for (the "Roof Contract"); and (b) emergency water damage mitigation pursuant to a Construction Services Agreement dated October 1, 2018 in the amount of $599,739.15 (the "Mitigation Contract"; collectively with the Roof Contract, the "Contracts"). Each of the Contracts was negotiated and signed by Casey Berman as General Manager (the "General Manager") of "Frank Theater Coastal Stadium" or "Coastal Stadium Ten" (each of which are now known as Frank All Star).

13. Cotton additionally provided an estimate for a third phase of work to complete the interior reconstruction of the Theater Property in the amount of $342,354.58.

14. The Roof Contract stated an "Initial Contract Price" of $496,908.28 and included the following provisions related to insurance:

> Section 3.4   Insurance Coverage. So long as any Invoices remain unpaid by [the Frank Parties], all payments made or to be made by Insurance Carrier to [the Frank Parties] in connection with the Work must be made payable by check or checks jointly payable to [the Frank Parties] and [Cotton]. ***Upon issuance of a check by Insurance Carrier to [the Frank Parties], [the Frank Parties] shall promptly endorse and deliver the same to [Cotton]. . . .***
>
> Section 3.5. Trust Funds. All sums tentatively earned by [Cotton] and retained by [the Frank Parties] by reason of the partial or complete performance of the Work and any balance of the unearned Contract Price, and all retainage ***shall constitute a trust fund for the purposes of (a) first, full completion of the Work, (b) second, payment of any claims due Cotton] from [the Frank Parties]. . . .***

(emphasis added).

15. The Roof Contract makes clear that failure to comply with Section 3.4 constitutes a material breach of the contract terms. Roof Contract § 3.4 ("Owner's failure to comply with this Section 3.4 shall be a material breach of this Contract.").

16. The Mitigation Contract stated an "Initial Contract Price" of $599,739.15. Like the Roof Contract, the Mitigation Contract included the following provisions related to insurance:

> Section 3.4   Insurance Coverage. So long as any Invoices remain unpaid by [the Frank Parties], all payments made or to be made by Insurance Carrier to [the Frank Parties] in connection with the Work must be made payable by check or checks jointly payable to [the Frank Parties] and [Cotton]. ***Upon issuance of a check by Insurance Carrier to [the Frank Parties], [the Frank Parties] shall promptly endorse and deliver the same to [Cotton]. . . .***
>
> Section 3.5. Trust Funds. All sums tentatively earned by [Cotton] and retained by [the Frank Parties] by reason of the partial or complete performance of the Work and any balance of the unearned

5

>Contract Price, and all retainage *shall constitute a trust fund for the purposes of (a) first, full completion of the Work, (b) second, payment of any claims due Cotton] from [the Frank Parties]. . . .*

(emphasis added).

17. Also like the Roof Contract, the Mitigation Contract makes clear that failure to comply with Section 3.4 constitutes a material breach of the contract terms. Mitigation Contract § 3.4 ("Company's failure to comply with this Section 3.4 shall be a material breach of this CSA.").

### iii. Cotton Completed Performance Under the Contracts and Two Independent Parties Join Frank All Star in Confirming Completion of Cotton's Work.

18. A loss adjuster, Engle Martin & Associates ("EMA"), was assigned to manage the claims related to the Theater Property under the Insurance Policy.

19. EMA reviewed all of Cotton's estimates and invoices and used an outside construction consulting firm, Madsen, Kneppers & Associates, Inc. ("MKA"), to further evaluate Cotton's pricing and performance under the Contracts.

20. Cotton began work at the Theater Property on or about September 2018 and completed the scope of work under the Mitigation Contract in October 2018. Cotton submitted its final invoice on October 15, 2018.

21. After EMA reviewed the final invoice, and MKA audited it and verified Cotton's on-site performance, the invoice was approved for payment. The final audited and approved invoice for Cotton's performance under the Mitigation Contract was $476,478.87.

22. In early November 2018, Cotton was asked to temporarily suspend its work at the Theater Property. Cotton understood this request was issued by Frank All Star's "corporate management," including Christopher Lang, an outside consultant engaged to manage the operations of Frank All Star and its affiliates.

WBD (US) 48679449v3

23. After a brief delay, on November 8, 2018, the Vice President of Frank Entertainment Group, Joe Davis, instructed Cotton to resume work and complete performance under the Roof Contract. Mr. Lang, as well as Frank All Star's local representative and General Manager, Casey Berman, who executed the Contracts with Cotton, were copied on Mr. Davis's e-mail correspondence confirming this directive.

24. Cotton recommenced work at the Theater Property at the direction of Mr. Davis and with the full knowledge of Mr. Lang, and in December 2018, Cotton completed the remaining scope of work under the Roof Contract. Cotton submitted its final invoice on December 25, 2018.

25. After EMA reviewed the final invoice, and MKA audited it and verified Cotton's on-site performance, the invoice was approved for payment. The final audited and approved invoice for Cotton's performance under the Mitigation Contract was for $496,908.28.

26. In March 2019, EMA submitted a statement of loss to the insurer detailing a partial claim under the Insurance Policy for damages to the Theater Property. EMA's statement of loss specifically sought payment for "*Emergency Services of Cotton*" in the amount of $476,478.87, "*Roofing Replacement of Cotton*" in the amount of $496,908.28, and "*Remaining Repair Proposal of Cotton*" in the amount of $342,354.58.

27. Following submission of EMA's statement of loss, the Frank Parties entered and submitted a separate sworn statement in proof of loss to the insurer. Frank's sworn statement mirrored EMA's statement and sought payment in the same amounts owed for Cotton's work to repair the Theater Property.

28. As a caution against insurance fraud, the Frank Parties' sworn statement incorporates the following warning:

> ***Fraud Warning:*** *It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties*

7

> *include imprisonment and/or fines. In addition, an insurer may deny insurance benefits, if false information materially related to a claim was provided by the applicant.*

(emphasis added).

29. The Frank Parties' sworn statement was executed by Christopher Lang, who was then acting as the court-appointed Chief Restructuring Officer of the Frank Parties in the Bankruptcy Case. As Chief Restructuring Officer, upon information and belief, Mr. Lang acted on behalf of the Frank Parties with all requisite authority in submitting Frank's statement to the insurer.

    iv. **The Insurer Issues a Joint Check for Payment of the Building Loss Claim Under the Insurance Policy**

30. Based on EMA's statement of loss and Frank's sworn statement, the insurer issued a check for the building loss component of the Frank Parties' claim under the Insurance Policy in the amount of $948,736.35 (the "Building Loss Check").

31. Upon information and belief, the insurer made the Building Loss Check jointly payable to one or more of the Frank Parties and STORE, as co-loss payees under the Insurance Policy.

32. The amount of the Building Loss Check corresponds to the amounts set out in EMA's and Frank's statements and represents the sum of the Mitigation Contract, the Roof Contract, and Cotton's estimate for the third phase for interior reconstruction, reduced by the unpaid deductible under the Insurance Policy.

33. Despite repeated inquiries from Cotton and its counsel, Cotton has not been paid a dollar for the nearly $1 million in services it performed at the Theater Property. Upon information and belief, the Building Loss Check remains in the possession of the Frank Parties or their counsel, and no party has endorsed, deposited, or otherwise negotiated the Building Loss Check.

34. The Theater Lease has been rejected by the Frank Parties in these bankruptcy cases, and Firstrun has assumed possession of the Theater Property.

35. Upon information and belief, and through no fault of Cotton, the mechanical system used to heat and cool the Theater Property is in a state of disrepair and/or has not been operated to maintain a climate controlled environment, causing additional damage and deterioration of Cotton's previously completed restoration work.

    v.    **Cotton's Stay Relief Motion**

36. Pursuant to the terms of the Debtors' confirmed Plan, no distribution is anticipated to Cotton from the Frank Parties beyond Cotton's rights, as they exist, to the insurance proceeds paid pursuant to the Building Loss Check.

37. Accordingly, on August 14, 2019, Cotton filed a motion seeking relief from the automatic stay imposed by Bankruptcy Code section 362 and the plan injunction to pursue an action to determine Cotton's rights to the proceeds of the Building Loss Check (Docket No. 706) (the "Stay Relief Motion").

38. On December 5, 2019, following a hearing, the Court entered an Order (Docket No. 811) (the "Stay Relief Order") granting Cotton's Stay Relief Motion, which, *inter alia*, lifted the automatic stay and/or modified the Plan injunction to permit Cotton "to proceed to commence and litigate an action to determine its rights to the insurance proceeds paid pursuant to the Building Loss Check." Stay Relief Order at 2.

**C. The Administrative and Priority Claims Agent's Claim Objection**

39. On January 29, 2020, the Administrative and Priority Claims Agent filed the Claim Objection. The Claim Objection seeks, *inter alia*, to reduce the Cotton Claim to $0.00 and expunge it from the claims register. The Claim Objection provided very little description of the basis for

the Administrative and Priority Claims Agent's objection to the Cotton Claim, and only summarily stated that the "Debtors were not in privity of contract with claimant and never authorized the claimant to conduct the work for which the claim relates." Claim Objection Ex. C.

## OBJECTION

40. The Debtors assert that they lack privity of contract with Cotton because they did not authorize Cotton to do the work under the Contracts. However, as described herein, Cotton performed under valid contracts that were duly executed by Frank All Star, or, in the alternative, the Frank All Star's principals ratified the Contracts by requesting that the work go forward or were unjustly enriched by Cotton's performance under the Contracts. Accordingly, Cotton respectfully submits that the Claim Objection is without merit and should be overruled as to the Cotton Claim.

### A. North Carolina Law Governs the Dispute

41. As a preliminary matter, the Contracts provide that they shall be construed "in accordance with the law of the place where the Property is located" (i.e., North Carolina). Mitigation Contract § 8.1; Roof Contract § 8.1. Although a contractual choice of law provision may not be considered when the validity of a contract is disputed, New Jersey courts apply the "most significant relationship" test in determining the proper law to apply to a contract validity dispute. As described in the Restatement (Second) of Conflicts of Law, the "most significant relationship" test considers the totality of the circumstances, including "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." McHale v. Kelly, 2012 WL 6089687, at *1 n.2 (D.N.J. Dec. 6, 2012) (providing that "New Jersey applies the 'most significant

relationship test' set out in the Restatement (Second) of Conflicts of Laws); see also Restatement (Second) of Conflicts of Laws, § 145(2).

42. Here, an analysis of the facts in light of these factors lead to an application of North Carolina law. The Contracts were formed in North Carolina, related to services that would be provided in North Carolina, and related to property located in North Carolina. The Debtors' failure to pay Cotton arose from the work done in North Carolina. Although Frank All Star and Cotton are not incorporated in North Carolina, each regularly conducted business in North Carolina. The only relationship between Frank All Star and Cotton existed in North Carolina, and is therefore centered in North Carolina. Accordingly, in light of these facts and the analysis governing applicable law, Cotton submits that North Carolina law governs the dispute.

### B. The Contracts Were Validly Executed by Frank All Star's General Manager as Agent, and Thus, Are Binding on Frank All Star

43. The Debtors' argument that they lack "privity" with Cotton fails because the Contracts were duly executed by a general manager acting as the Frank All Star's agent with appropriate authority. Under North Carolina law, courts look to two elements to determine whether a principal-agent relationship exists: "(1) authority, either express or implied, of the agent to act for the principal, and (2) the principal's control over the agent." Holcomb v. Colonial Assocs., L.L.C., 597 S.E.2d 710 (N.C. 2004). An employee such as the General Manager is an agent of its employer. See Agent, Black's Law Dictionary (11th ed. 2019) (describing a corporate agent as "all employees who have the power to bind the corporation."). Accordingly, the scope of the General Manager's authority to act as agent is only at issue.

44. As North Carolina courts have held, the authority of an agent under North Carolina law can be expressed as either actual, implied, or apparent authority. Foote & Davies, Inc. v. Arnold Craven, Inc., 324 S.E.2d 889, 891 (N.C. App. 1985). Actual authority is that which "the

agent reasonably thinks he possesses, conferred either intentionally or by want of ordinary care of the principal." Harris v. Ray Johnson Const. Co., Inc., 534 S.E.2d 653, 655 (N.C. App. 2000) (citing Foote, 324 S.E.2d at 892). "Actual authority may be implied from the words and conduct of the parties and the facts and circumstances attending the transaction in question." Id. For example, the North Carolina Court of Appeals has held that an attorney has the *actual* authority to settle a claim on behalf of its client when he "reasonably believe[s] at the time of negotiation that he could settle the case" for a certain amount, despite a lack of "clear agreement as to the proper amount" with the principal. Harris, 534 S.E.2d at 655.

45. On the other hand, North Carolina law provides that the apparent authority of an agent "is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses." Pet, Inc. v. Univ. of N.C., 323 S.E.2d 745, 750 (N.C. App. 1984). Apparent authority "includes the authority to do whatever is usual and necessary to transact business an agent is employed to transact." Foote, 324 S.E.2d at 892. "The law of apparent authority usually depends upon the unique facts of each case, such as the ordinary course of business, the nature and reasonableness of the contract, the officer negotiating it, the size of the corporation, and the number of shareholders." Id. at 893.

46. With respect to third parties, North Carolina has long held that "[w]hen a third person has ascertained the apparent authority with which the principal has clothed the agent, he is under no further obligation to inquire into the agent's actual authority." Charleston & W.C. Ry. Co. v. Robert G. Lassiter & Co., 177 S.E. 9, 12 (N.C. 1934). "The authority must, however, have been actually apparent to the third person, who, in order to avail himself of rights thereunder, must have dealt with the agent in *reliance thereon, in good faith, and in the exercise of reasonable prudence,* in which case the principal will be bound by acts of the agent performed in the usual

and customary mode of doing such business, although he may have acted in violation of private instructions, for such acts are within the apparent scope of his authority." Id. (emphasis added).

47. The Debtors' puzzling assertion that the General Manager lacked authority to bind the Frank Parties to the Contracts is wholly without merit. The Debtors seek to invalidate the Contracts—under which Cotton has fully performed—on the basis that the General Manager of the Theater Property was not the proper signatory to the Contracts. Following Hurricane Florence, the General Manager contacted Cotton to negotiate the Contracts. Cotton understood that the General Manager was acting in its capacity as the highest ranking local representative and agent of Frank All Star with respect to the Theater Property, and that the General Manager had the ultimate discretion to negotiate and execute the Contracts. At no time during negotiations did any other representative from the Frank Parties seek to intervene in the negotiations and prevent the General Manager from representing itself as agent of Frank All Star regarding the repair work to be done on the Theater Property.

48. Further, the objection to the Cotton Claim asserted by the Debtors, if sustained, would lead to absurd results requiring any potential contract counterparty to perform much more than a "reasonably prudent" investigation into the scope of the agent's authority. Fortunately, that is not the law in North Carolina. Cotton performed a reasonably prudent investigation of the General Manger's authority, and, based on its investigation and in reliance on the General Manager's representations, determined that the General Manager was a representative of the Frank Parties responsible for the Theater Property. Further, Cotton engaged in good faith, arms'-length negotiations with the General Manager (acting on behalf of Frank All Star), and relied on all representations made by the General Manager during such negotiations.

13

49. Accordingly, Cotton submits that the General Manager had the appropriate authority, either actually or apparently, to execute the Contracts. The Contracts are therefore valid contracts between Cotton and Frank All Star, and must be honored. Disallowance of Cotton's claim under the Contracts would wholly invalidate the Contracts and deprive Cotton of its bargained-for rights thereunder. Cotton submits that the Claim Objection should be overruled as to the Cotton Claim, and requests that its claim be allowed in full pursuant to the Contracts.

### C. Ratification

50. Even if the General Manager lacked authority to bind Frank All Star, the Frank Parties subsequently ratified the Contracts.

> If certain acts have been performed or contracts made on behalf of another without his authority, he has, when he obtains knowledge thereof, an election either to accept or repudiate such acts or contracts. If he accepts them, his acceptance is a ratification of the previously unauthorized acts or contracts, and makes them as binding upon him from the time they were performed as if they had been authorized in the first place.

Carolina Equip. & Parts Co. v. Anders, 144 S.E.2d 252, 257–58 (1965).

51. To establish ratification of the unauthorized transactions of an agent, the party claiming ratification must prove (1) that at the time of the act relied upon, the principal had full knowledge of all material facts relative to the unauthorized transaction and (2) that the principal had signified his assent or his intent to ratify by word or by conduct which was inconsistent with an intent not to ratify. Id. at 400-01 (internal citations omitted).

52. In early November 2018, Cotton was instructed to cease working on the project. Upon information and belief, this instruction was given because the Frank Parties were investigating whether Cotton was properly retained. However, on November 8, 2018, the Vice President of Frank Entertainment Group, Joe Davis, instructed Cotton to resume work and complete performance under the Roof Contract. Mr. Lang, as well as Frank All Star's local

WBD (US) 48679449v3

representative and General Manager, Casey Berman, who executed the Contracts with Cotton, were copied on Mr. Davis's e-mail correspondence confirming this directive. None of these people objected to Mr. Davis' instruction or suggested that this directive was unauthorized.

53. In fact, Mr. Lang not only accepted and did nothing to intervene with Cotton's continued performance under the Contracts, he later signed and submitted a sworn statement of loss, subject to penalties for insurance fraud, on the basis of "*Emergency Services of Cotton*" in the amount of $476,478.87, "*Roofing Replacement of Cotton*" in the amount of $496,908.28, and "*Remaining Repair Proposal of Cotton*" in the amount of $342,354.58.

54. Accordingly, even if the Contracts are not binding for lack of authority, the principal had full knowledge of all material facts relative to the Contracts and nevertheless instructed Cotton to continue performance of the Contracts through the email directive to continue performance and by conduct which was inconsistent with an intent not to ratify the Contracts.

**D. Unjust Enrichment**

55. Even if the Court determines that there was no contract between Cotton and the Frank All Star, Cotton remains entitled to a claim based on unjust enrichment.

56. The Restatement of Restitution § 1 lays down the general principle that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." Booe v. Shadrick, 322 N.C. 567, 570 (N.C. 1988). To establish a claim for unjust enrichment, a party must have conferred a benefit on the other party, the benefit must not be gratuitous, and it must be measurable. Additionally, "the defendant must have consciously accepted the benefit." Id. at 556, 570.

57. In this case, all factors for establishing unjust enrichment are satisfied. Frank All Star benefitted from the roof reconstruction/replacement and the emergency water damage

15

mitigation performed by Cotton. Frank All Star was a tenant of the Theater Property, with, upon information and belief, a duty to repair such property. Further, absent repair, the Theater Property would have been unable to generate income for Frank All Star's benefit.

58. The roof reconstruction/replacement and emergency water damage mitigation was not performed by Cotton gratuitously. Cotton negotiated the Contracts at arms'-length and with the intent to be fairly compensated for its skill, labor, and expenses. A price was negotiated and should have been paid.

59. Finally, Frank All Star consciously accepted the benefit. The Frank Parties did not object to the Cotton construction crew's presence at the Theater Property. The Frank Parties did not object to Cotton's repair of the roof. The Frank Parties did not object to Cotton's mitigation of the water damage. Rather, the Frank Parties instructed Cotton on the work to be performed and told Cotton, with the knowledge of the Chief Restructuring Officer, Mr. Lang, to continue and complete work on the Theater Property.

60. Accordingly, if the Court finds that the Contracts are not enforceable, Cotton nevertheless possesses a claim in the same amount for unjust enrichment.

## RESERVATION OF RIGHTS

61. This Preliminary Response is preliminary in nature and discovery is likely required to fully brief the legal issues raised by the Claim Objection. Accordingly, Cotton reserves the right to seek discovery and file a supplemental response to the Claim Objection.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Cotton respectfully requests that the Court (a) sustain this Preliminary Response, (b) deny the Claim Objection, and (c) grant Cotton such further relief as is appropriate under the circumstances.

Dated:  February 24, 2013                **WOMBLE BOND DICKINSON (US) LLP**

*/s/ Ericka F. Johnson*
Ericka F. Johnson, Esq. (NJ Bar No. 032162007)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Phone: (302) 252-4320
Fax: (302) 252-4330
E-mail: Ericka.Johnson@wbd-us.com

-and-

Richard A. Prosser, Esq.
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Phone: (919) 755-2100
E-mail: Richard.Prosser@wbd-us.com

*Attorneys for Cotton Commercial USA, Inc.*